1  RICK D. ROSKELLEY, ESQ., Bar # 3192
   WENDY MEDURA KRINCEK, ESQ., Bar # 6417
2  MONTGOMERY Y. PAEK, ESQ., Bar #10176
   MARCUS B. SMITH, ESQ., Bar # 12098
3  LITTLER MENDELSON, P.C.
   3960 Howard Hughes Parkway
4  Suite 300
   Las Vegas, NV  89169-5937
5  Telephone:   702.862.8800
   Fax No.:       702.862.8811
6

```
┌─────────────────────────────────┐
│ ___ FILED        ___ RECEIVED    │
│ ___ ENTERED      ___ SERVED ON   │
│           COUNSEL/PARTIES OF RECORD │
│     ┌─────────────────────┐      │
│     │    JUL 2 3 2014      │      │
│     └─────────────────────┘      │
│        CLERK US DISTRICT COURT    │
│         DISTRICT OF NEVADA        │
│   BY: _____ DEPUTY     │
└─────────────────────────────────┘
```

7  Attorneys for Defendants
   ALAN WAXLER GROUP CHARTER SERVICES, LLC,  ALAN
   WAXLER GROUP, LLC, ALAN WAXLER GROUP, INC., AWG
8  CORPORATE EVENTS, LLC, and ALAN WAXLER

9                    UNITED STATES DISTRICT COURT

10                       DISTRICT OF NEVADA

11

12  ROBERT GREENE, on behalf of himself    Case No. 2:09-cv-000748-JCM-NJK
    and all other similarly situated,      consolidated with: 2:09-cv-0914-LDG-
13                                          PAL
                 Plaintiffs,
14
    vs.                                     DEFENDANTS' TRIAL BRIEF
15
    ALAN WAXLER GROUP CHARTER               Trial Date:   July 28, 2014
16  SERVICES, LLC d/b/a AWG CHARTER         Trial Time:   9:00 a.m.
    SERVICES, a Nevada Limited Liability
17  Company, Does 1-50, inclusive,

18               Defendants.

19  SAMUEL BAUM, SANDY BOUGHNER,
    BRAD CLARK, KEITH JACKSON, ALLAN
20  DOUTHARD, MICHAEL KALEIKIN,
    JOSEPH PELLEGINO, ZBIGNIEW
21  OBRYCKI, JUAN IGLESIA, WALTER
    CLARK, IVRON MAYFIELD, GEORGE
22  VANDE LOGT, ROBERT REED, PAUL
    LAUZEN, TROY SMITH, FERENC
23  ZOMBORI, and JACQUELINE
    THOMPSON,
24
                 Plaintiffs,
25
    vs.
26
    ALAN WAXLER, an individual; ALAN
27  WAXLER GROUP, INC., a Nevada
    Corporation dba AWG, INC.; ALAN
28  WAXLER GROUP, LLC, a Limited Liability

LITTLER MENDELSON, P.C.
    Attorneys At Law
3960 Howard Hughes Parkway
       Suite 300
Las Vegas, NV  89169-5937
    702.862.8800

Company; ALAN WAXLER GROUP
CHARTER SERVICES, LLC, a Limited
Liability Company; AWG, LTD., a Nevada
Corporation; AWG MANAGEMENT
COMPANY, LLC, a Limited Liability
Company; and AWG CORPORATE
EVENTS, LLC, a Limited Liability
Company,

Defendants.

Defendants (1) Alan Waxler Group Charter Services, LLC dba AWG Charter Services; (2) Alan Waxler; (3) Alan Waxler Group, Inc. dba AWG, Inc.; (4) Alan Waxler Group, LLC; (5) AWG Ltd.; and (6) AWG Corporate Events, LLC (hereinafter collectively referred to as "AWG" or "Defendants")[1], by and through their counsel of record, Littler Mendelson, P.C., hereby provide their trial brief in this matter.

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

As was recently stated in *Duran v. U.S. Bank National Bank*, before this Court is "an exceedingly rare beast: a wage and hour class action that proceeded through trial." *Duran v. U.S. Bank National Association*, S200923 (CA May 29, 2014).  Rarer still, and possibly unique, is a case such as this where the Plaintiffs are proceeding with a class action trial with no class evidence whatsoever.  This lack of evidence is fatal to Plaintiffs' class claims. In *Duran*, the trial court attempted to use the testimony of 21 plaintiffs to extrapolate misclassification allegations to a class of 260 plaintiffs.  *Id.*  In reversing the trial court's efforts, the California Supreme Court held that any such sampling "must be developed with expert input and must afford the defendant an opportunity to impeach the model or otherwise show its liability is reduced" to avoid being "profoundly flawed." *Id.*  In the instant matter, Plaintiffs' entire case is, of necessity, based on non-expert sampling or some other

---

[1]  In the Joint Pretrial Order [Doc. #161], the parties mistakenly included "AWG Management Company, LLC" as one of the remaining Defendants.  AWG Management Company, LLC is not a proper party, however, as it was dismissed from the action through Plaintiffs' Notice and Judgment of Dismissal of Defendant AWG Management Company, LLC Only [Doc. #11] on June 10, 2009.  Similarly, named Defendant AWG, Ltd. was dismissed from the action through Plaintiffs' Notice and Judgment of Dismissal of Defendant AWG, Ltd. Only [Doc. #12] on June 10, 2009.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1  unscientific extrapolation as they have failed to either gather class-wide evidence of any
2  kind or produce expert testimony as to commonality or damages.  Indeed, Plaintiffs have
3  failed to fulfill even the most fundamental of their discovery obligations by not providing a
4  computation of damages as required by Fed. R. Civ. Pro. 26(a).  As such, Plaintiffs'
5  presentation of any evidence of damages beyond an individual basis would be unsupported
6  by law and a violation of Defendants' fourth amendment rights.

7       In this matter, Plaintiffs have brought consolidated collective and class claims
8  against Defendants for alleged minimum wage and overtime-based violations based on
9  misclassification arguments and alleged off-the-clock work.  In the underlying litigation,
10 Plaintiffs failed to conduct any discovery that would allow Plaintiffs to meet their burden of
11 proof at trial as to class liability or damages.

12      This failure rests squarely on Plaintiffs.  Plaintiffs adamantly opposed Defendants'
13 efforts to reopen discovery which would have applied to all parties.  By slamming the door
14 on Defendants' efforts to conduct further discovery, however, Plaintiffs also extinguished
15 their only means to obtain class discovery.  Plaintiffs' rush to close discovery permanently
16 has left Plaintiffs with no expert report, no depositions and no complete pay or time records
17 on which to base liability and damages.  Based on their own closed universe, Plaintiffs can
18 no longer maintain an action for collective and class claims.  Instead, Plaintiffs must now
19 move forward with what they have – eighteen named single plaintiffs in a consolidated
20 case.

21 **II.  FACTUAL BACKGROUND**

22      This consolidated action is for minimum wage and overtime related allegations
23 brought by former charter drivers.  Of the named Defendants, only Defendant Alan Waxler
24 Group Carter Services, LLC, dba AWG Charter Services (hereinafter "AWGCS") ever
25 employed drivers.  AWGCS was a Las Vegas-based limousine service for private tours,
26 corporate charters, airport shuttles, and transportation services that ceased conducting
27 business operations and employed no drivers in June 2011.  Defendants Alan Waxler
28 Group Inc. dba AWG, Inc.; Alan Waxler Group, LLC; AWG Ltd. AWG Management

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

3.

1   Company, LLC; AWG Corporate Events, LLC; and Alan Waxler are not properly named in

2   the suit as none of these parties ever employed any drivers.[2] Although the statutory period

3   in this matter is the two-year period from 2007 to the filing of the Complaint in 2009, this

4   brief will also address the equitable tolling period through 2003 that this Court ordered to be

5   pruned once discovery was complete and the case was ready for trial.

6       **A.    AWGCS's Operations And Regulation.**

7       From 2003 until it ceased operations in 2011, AWGCS was a Nevada company

8   transporting passengers both on a pre-paid and non-pre-paid basis to and from hotels,

9   other places of business, residences located in Nevada, to locations within Nevada,

10  including McCarran International Airport, as well as, to locations outside Nevada such as

11  California, Arizona, Utah and federal tribal lands.  During this time, approximately 95% of

12  these trips were prearranged and known as "charters."

13      As part of its interstate services and other licensing requirements, AWGCS was

14  licensed by the Nevada Transportation Authority (hereinafter "NTA") and U.S. Department

15  of Transportation (hereinafter "DOT") under U.S. DOT Number 794834.  AWGCS was also

16  required to register and is registered with the Federal Motor Carrier Safety Administration

17  ("FMCSA").

18      In compliance with FMCSA requirements for interstate drivers, AWGCS drivers were

19  required to comply with FMCSA and Motor Carrier Safety Regulations rules and regulations

20  regarding commercial driver licensure, medical fitness and drug and alcohol testing in

21  accordance with the Federal Motor Carrier Safety Regulations.  Further, drivers submitted

22  themselves to pre-hire physical examinations, as well as drug and alcohol testing required

23  by Motor Carrier Safety Regulations.  To this end, AWGCS scheduled and monitored the

24

25  [2] Additionally, Defendant Alan Waxler Group Inc. dba AWG, Inc. is no longer in existence, and its status with the Nevada Secretary of State is "revoked"; Defendant Alan Waxler Group, LLC, is a is is a single source destination management company offering versatile event planning in Las Vegas for events such as corporate meetings, conventions, and incentive programs and was never in the business of employing drivers; Defendant AWG Corporate Events, LLC, never employed drivers, no longer exists, and its status with the Nevada Secretary of State is "permanently revoked"; and Defendant Alan Waxler is an individual who does not personally employ drivers.

26

27

28

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

4.

1  driving hours of drivers to ensure compliance with the detailed hours of service regulations
2  governing drivers of vehicles in interstate commerce operations found at 49 C.F.R. §395.
3  Additionally, AWGCS maintained the required DOT records and "driver qualification" file for
4  each driver as required and defined by 49 C.F.R. §391.51(a).

5      In addition to the NTA, DOT and FMCSA regulation of AWGCS, the Transportation
6  Security Administration ("TSA") performed audits of AWGCS and enforced vehicle
7  regulations found in Title 49 of the United States Code (comprehensive vehicle inspections
8  and review of employee files).  Drivers also performed vehicle safety inspections on a daily
9  basis (brakes, tires, body damage, lights, turn signals, transmissions, and leaks).  In
10  addition to these various forms of regulation, approximately 80% of drivers employed by
11  AWGCS held a commercial driver's license ("CDL").

12      Due to its compliance with various transportation regulations and agencies, AWGCS
13  derived much of its revenue from through-ticketing travel and out of state trips.  During
14  2008 for example, 38% of AWGCS revenue was derived from prepaid trips to and from
15  McCarran International Airport transporting passengers to or from the airport arriving from
16  and/or departing to other states.  Additionally, from 2007 through 2009, approximately 17%
17  of revenues were derived from trips originating in Nevada to places outside of Nevada such
18  as Arizona, California, Paiute Indian Reservation, across the state line to the Hoover Dam.

19      Thus, AWGCS drivers have always been in compliance with these regulations and
20  AWGCS classified drivers as exempt from the overtime requirements of the FLSA by virtue
21  of the motor carrier exemption.  Further, AWGCS paid drivers minimum wage, including
22  minimum wage for training, mandatory meetings and safety meetings.  Therefore, AWGCS
23  was in compliance with wage laws from 2003 through 2011.

24      **B.    AWGCS' Fleet of Vehicles.**

25      Although the exact number of vehicles has varied during the class period
26  commencing in 2003, AWGCS' fleet of vehicles has generally consisted of:  sedans, SUVs,
27  limousines, coaches and buses.  Coaches included "limo coaches" which were vehicles in
28  excess of 14,000 pounds but were configured with limousine-style couch seating inside.

5.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1  Limousines included stretch limousines that held 8-passengers or more and regular
2  limousines that could hold 6-passengers.  Non-limousine sedans held 3-passengers while
3  SUVs held 6-passengers.  All vehicles were placarded with either a CPCN or U.S. DOT
4  number.  Each coach and bus weighed in excess of 14,000 pounds.

5         **C.     AWGCS' Driving Assignments And Pool of Drivers.**

6         AWGCS assigned drivers to a variety of different types of assignments such as
7  Kellys, charters and shuttles.  A "Kelly" driving assignment involved a driver being stationed
8  at a fixed location such as a hotel/casino or airport.  The driver would be engaged by
9  customers on the spot for transportation or as arranged by the hotel, and would return to
10 the same location upon completion of the driving assignment to await the next customer.  A
11 charter assignment, on the other hand, was a driving assignment that was pre-booked by a
12 customer.  A shuttle assignment was a driving assignment to provide shuttle service upon a
13 fixed route upon a fixed schedule.

14        Drivers assigned to Kelly driving assignments would generally know the days and
15 hours they would be working in advance while drivers working charters had less
16 predictability.  In this regard, charter drivers were not guaranteed any set number of hours.
17 Schedules varied day-to-day for each driver and were based upon business needs of
18 AWGCS and driver availability.  Drivers were not categorized by vehicle type and there was
19 no formula as to whether a driver would drive a particular vehicle or a certain category of
20 vehicle.

21        At all relevant times, the charter driving assignments for all vehicles were made by
22 AWGCS utilizing their pool of available drivers.  Drivers were contacted and offered
23 assignments.  Assignments rejected or not responded to would then be offered to the next
24 driver in the pool.  Thus, all drivers were part of this pool and any driver could be used for
25 an interstate trip as needed.

26        Approximately 70% of drivers routinely drove buses and coaches.  Drivers without
27 active assignments were not required to remain on AWGCS property, and were informed
28 that if they wished to be on AWGCS property in order to be readily available for charter

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702 862 8800

6.

assignments booked by customers on short notice that they were doing so on a voluntary basis and there was no guarantee of work or compensation.  At times, when AWGCS determined its business needs were such that it was beneficial to have a driver available notwithstanding an absence of any concrete driving assignments for the driver, it would ask a driver if they wished to be on "stand-by".  AWGCS paid these drivers more than minimum wage for all time spent on "stand-by."

AWGCS had eleven 56-passenger buses that shuttled employees across the Nevada/California state line to and from the Primm Golf Course in California.  Additionally, AWGCS frequently contracted with customers to provide transportation to and from McCarran International Airport to complete or commence interstate travel.   Further, AWGCS frequently contracted with its affiliated destination management company to provide transportation for groups arriving from out of state and returning to the airport for interstate travel.  Thus, out-of-state travel was a significant portion of AWGCS' business that required drivers from the pool to be available for out-of-state trips.

### D.    AWGCS Pay-Related Practices.

As to health benefits, AWGCS offered Plaintiffs qualifying health benefits at a total cost to the employee for premiums of not more than 10 percent of the employee's gross taxable income.  Thus, under the Nevada constitutional amendment enacted on November 28, 2006, Plaintiffs were subject to the lower minimum wage rate in Nevada for employees who are offered qualifying health benefits.

At all relevant times, prior to performing any work, drivers would report to the dispatch window at AWGCS.  At the dispatch window, drivers were provided a trip sheet, assigned a vehicle and provided the keys to the vehicle.  In compliance with Nevada Transportation Authority requirements, drivers would immediately time stamp the trip sheet using a time stamp located in proximity to the dispatch window.  Drivers did not perform any work prior to time stamping the trip sheet and could not have performed any work as they had just received their vehicle assignment and keys to the vehicle.  After completing all work and in compliance with Nevada Transportation Authority requirements, drivers also

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702 862 8800

time stamped their ending time of work.  No work was performed by drivers before the time stamp indicating the driver's start time or after the time stamp indicating the driver's end time.

By no later than March 1, 2009 and until it ceased operations, AWGCS installed time clocks and drivers clocked in prior to performing all work and clocked out after completing all work.  After clocking in, drivers reported to the dispatch window in the same lobby and received their trip sheet, vehicle assignment and keys, and time stamped the trip sheet.  Drivers continued to also time stamp trip sheets with the ending time of their work.  Drivers were paid based upon the work time reflected in the time clock and received in excess of the federal and state minimum wage for all hours recorded.

In addition to being time stamped, trip sheets are used by drivers each day to record information about each driving assignment including scheduled pick-up time and location, actual drop-off time, drop-off location, vehicle assignment, fuel and mileage information, actual driving time, amount of billable time (meaning the amount of time to be billed to the customer) and total hours driven.  Drivers could also record comments and signed and dated the trip sheet.

Prior to the usage of time clocks, drivers were paid based upon billable time meaning that drivers were paid based upon the billable time recorded on the trip sheet, which is the amount of time to be billed to the customer, in addition to any additional compensation paid to the driver, such as an hourly rate above the state and federal minimum wage rates for "stand-by" time.  Billable time routinely exceeded actual driving time.  For example, if a customer booked a vehicle for 10 hours and released the driver after only 5 hours because the transportation service was no longer needed, the driver would be paid for 10 hours.  Consequentially, drivers were at times paid for more billable hours than they actually worked on a given day.  During the time period that AWGCS paid based upon the billable hours, for a period of time, shuttle drivers were paid in addition to billable time for two additional hours of work (one hour for pre-trip work and one hour for post-trip work).

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

8.

During the relevant period until June 26, 2010, hourly pay rates for driving assignments were determined by the type of assignment and length of employment. For example, differing hourly rates applied to (1) assignments to drive motor coaches, (2) shuttle driving assignments, (3) assignments booked by Alan Waxler Group, LLC (the destination management company affiliated with AWGCS), (4) Kelly assignments, and (5) regular charter assignments. The hourly rate further varied for some types of assignments, including regular charter assignments based upon years of employment with AWGCS.

From June 26, 2010 until AWGCS ceased operating, drivers were paid differing hourly pay rates based upon (1) whether it was a shuttle or non-shuttle driving assignment; and (2) years of service. Non-shuttle driving assignments received a higher pay rate because of the decreased opportunity to receive gratuities. Non-shuttle driving assignments were paid at least $8.50 an hour and shuttle assignments were paid at least $13.00 per hour.

In addition to these pay rates, drivers typically received gratuities from customers. Cash gratuities paid to drivers were not turned in by drivers to AWGCS and would not be recorded in their earnings. AWGCS maintained records of hours worked by hours by virtue of the trip sheets, which include time stamps indicating the start time and end time of work and time clock records. AWGCS further maintained records of wages paid to drivers.

**E.    Individual Drivers.**

The following drivers are the eighteen named Plaintiffs that allege that they were not properly paid minimum wage or overtime by the Defendants: (1) Robert Greene, (2) Samuel Baum, (3) Sandy Boughner, (4) Brad Clark, (5) Keith Jackson, (6) Allen Douthard, (7) Michael Kaleikini, (8) Joseph Pellegino, (9) Zbigniew Obrycki, (10) Juan Iglesia, (11) Walter Clark, (12) Ivron Mayfield, (13) George Vande Logt, (14) Robert Reed, (15) Paul Lauzen, (16) Troy Smith, (17) Ferenc Zombori, and (18) Jacqueline Thompson. The following is a summary of each driver's employment dates, licensure, vehicle types and out of state travel:

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

9.

1.     Plaintiff Robert Greene was employed by AWGCS from August 18, 2008 until August 4, 2010. Plaintiff Greene held a commercial driver's license continuously during his employment with AWGCS, drove limousines and was at all times subject to driving in interstate commerce.

2.     Plaintiff Sam Baum was employed by AWGCS from May 24, 2003 until February 16, 2006. Plaintiff Baum held a commercial driver's license continuously during his employment with AWGCS, drove limousines and coaches, and was at all times subject to driving in interstate commerce.

3.     Plaintiff Sandy Boughner was employed by AWGCS from March 2005 until March 2007. Plaintiff Boughner held a commercial driver's license continuously during her employment with AWGCS, drove limousines and limo coaches and was at all times subject to driving in interstate commerce.

4.     Plaintiff Brad Clark was employed by AWGCS from June 2002 until March 2006. Plaintiff Clark held a commercial driver's license continuously during his employment with AWGCS, drove limousines and motor coaches and was at all times subject to driving in interstate commerce.

5.     Plaintiff Keith Jackson was employed by AWGCS from September 2003 until January 29, 2007. Plaintiff Jackson held a commercial driver's license continuously during his employment with AWGCS, drove limousines and was at all times subject to driving in interstate commerce.

6.     Plaintiff Allen Douthard was employed by AWGCS from March 29, 2004 until August 11, 2004. Plaintiff Plaintiff Douthard held a commercial driver's license continuously during his employment with AWGCS, drove limousines and was at all times subject to driving in interstate commerce.

7.     Plaintiff Michael Kaleikini was employed by AWGCS from May 26, 2005 until 2007. Plaintiff Kaleikini was subject to driving in interstate commerce. Plaintiff Kaleikini held a commercial driver's license continuously during his employment with AWGCS, drove coaches and was at all times subject to driving in interstate commerce.

8.     Plaintiff Joseph Pellegrino was employed by AWGCS from September 11, 2003 until April 24, 2006. Plaintiff Smith held a commercial driver's license continuously during his employment with AWGCS, drove limousines, and was at all times subject to driving in interstate commerce.

9.     Plaintiff Zbigniew Obrycki was employed by AWGCS from May 2, 2005 until October 8, 2008 although he stopped working prior to that time when he took a leave of absence and failed to return to work. Plaintiff Obrycki held a commercial driver's license continuously during his employment with AWGCS, drove limousines, motor coaches and limo coaches,

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

and was at all times subject to driving in interstate commerce.

10.     Plaintiff Juan Iglesia was employed by AWGCS from May 2000 until September 4, 2009.  Plaintiff Iglesia held a commercial driver's license continuously during his employment with AWGCS, drove limo coaches and was at all times subject to driving in interstate commerce.  For some period of time Plaintiff Iglesia was employed as Assistant Safety & Training Supervisor at one wage rate and filled in as a driver at a different wage rate.  Plaintiff Iglesia ceased being a driver entirely effective January 20, 2006 when he was promoted to Supervisor Vehicle Maintenance Safety, a salaried-exempt position.  Plaintiff Iglesia subsequently resumed his position as a driver.  At the time of termination he was paid $13.00 per hour, plus gratuities.

11.     Plaintiff Walter Clark was employed by AWGCS from September 11, 2003 until April 22, 2009.  Plaintiff Clark took a leave of absence during 2007. Plaintiff Clark held a commercial driver's license continuously during his employment with AWGCS, drove limousines and motor coaches and was at all times subject to driving in interstate commerce.

12.     Plaintiff Ivron Mayfield was employed by AWGCS from May 22, 2006 until March 9, 2011. Plaintiff Mayfield was subject to driving in interstate commerce.  Plaintiff Mayfield held a commercial driver's license, drove limousines and was at all times subject to driving in interstate commerce.

13.     Plaintiff George Van de Logt was employed by AWGCS from July 28, 1999 until November 14, 2008.  On October 24, 2006, Plaintiff Van de Logt was promoted from driver to Supervisor Driver Training & Development, an exempt position for which he was paid a salary.  Prior to the promotion, Plaintiff Van de Logt was a driver and continuously held a commercial driver's license.  While a driver, Plaintiff Van de Logt drove limousines and was at all times subject to driving in interstate commerce.

14.     Plaintiff Robert Reed was employed by AWGCS from November 15, 2005 until June 11. 2009.  Plaintiff Reed held a commercial driver's license continuously during his employment with AWGCS, drove motor coaches, and was at all times subject to driving in interstate commerce.

15.     Plaintiff Paul Lauzen was employed by AWGCS from September 2002 until X.  Plaintiff Lauzen was subject to driving in interstate commerce.  Plaintiff Lauzan held a commercial driver's license continuously during his employment with AWGCS, drove limousines and motor coaches and was at all times subject to driving in interstate commerce.

16.     Plaintiff Troy Smith was employed by AWGCS from September 13, 2004 until X.  Plaintiff Smith was subject to driving in interstate commerce.  Plaintiff Smith held a

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

commercial driver's license continuously during his employment with AWGCS, drove limousines, motor coaches and mini buses, and was at all times subject to driving in interstate commerce. Plaintiff Smith drove to Knott's Berry Farm in California.

17.    Plaintiff Ferenc Zombori was employed by AWGCS from February 13, 2007 to February 13, 2009. Plaintiff Zombori held a commercial driver's license continuously during his employment with AWGCS, drove limousines, and was at all times subject to driving in interstate commerce.

18.    Plaintiff Jacqueline Thompson was employed by AWGCS from November 1, 2005 until January 25, 2010. Plaintiff Thompson held a commercial driver's license continuously during her employment with AWGCS, drove limousines and limo coaches, and was at all times subject to driving in interstate commerce.

With respect to any putative class members beyond the eighteen named Plaintiffs, Plaintiffs failed to produce evidence of the days worked, the hours worked, leaves or other time off, wages received or hourly rates of pay.  This evidence was available but never requested by Plaintiffs during discovery.  Even with respect to named plaintiffs, Plaintiffs failed to present evidence of the days worked, the hours worked, leaves or other time off, wages received or hourly rates of pay except for a limited number of named plaintiffs and for a limited time period.  Records of wages and hours worked was available but AWGCS objected to their production and Plaintiffs did not obtain or move to compel their production.

F.    **Procedural Background.**

1.    **Plaintiffs' pleadings.**

As the procedural history of this matter has a direct connection to the evidence and issues that will be presented at trial, a summary of the relevant procedural history is now provided to this Court.  On April 27, 2009, Plaintiff Robert Greene (hereinafter "Greene") filed his Complaint (hereinafter "Complaint") against Defendant Alan Waxler Group Charter Services, LLC dba AWG Charter Services for collective and class allegations on behalf of:

all persons who worked for the Defendants within the last three years as drivers of limousines, excluding all persons employed by defendant as drivers of taxicabs, and excluding all persons whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act of 1935 (such as employees who regularly transport passengers

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

interstate or to the airport on a "through ticket" interstate).

**Complaint [Doc. #1] at ¶10.** (Emphasis added). Thus, Greene specifically limited his class of putative plaintiffs to limousine drivers who were not exempt from overtime under exemptions for taxicabs or the Motor Carrier Act. *Id.*

Greene also acknowledged that, in addition to the Motor Carrier Act exemption from overtime, the Taxicab Exemption operated to bar claims for minimum wage and overtime under the FLSA. *See Complaint [Doc. #1] at ¶11.* Specifically, Greene pled that "taxicab drivers are exempt from the minimum wage and overtime compensation provisions of the federal Fair Labor Standards Act" while distinguishing his opinion that "limousine drivers are not." *Id.* at ¶11. Further, Greene pled that under NRS 706.8816(1), a Taxicab is a motor vehicle which is "designed or constructed to accommodate and transport not more than six passengers, including the driver," and is:

> (a) Fitted with a taximeter or other device to indicate and determine the passenger fare charged; (b) Used in the transportation of passengers or light express or both for which a charge or fee is received; or (c) Operated in any service which is held out to the public as being available for the transportation of passengers from place to place in the State of Nevada.

*Id.* at ¶12.

Additionally, Greene pled that there was also a "through-ticketing" exemption under Section 13(b)(1) of the Fair Labor Standards Act that exempted plaintiffs from overtime "in the case of a through-ticketing or other common arrangements for continuous passage or interchange between the motor carrier and the air carrier." *See Complaint [Doc. #1] at ¶14.*

Thus, after pleading these specific exemptions, Greene pled that the proposed class consisted of all persons who were employed as:

> limousine drivers within the last three years, excluding all persons employed by defendant as drivers of taxicabs. The class excludes drivers who, within a four month period, drove passengers traveling interstate on a "through ticket" from any airline, and excludes all employees over whom the Secretary of Transportation has the power to establish qualifications and

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act of 1935.

**See Complaint [Doc. #1] at ¶18.**  In relation to a proposed collective and Rule 23 class of "limousine drivers" subject to the above "exclude[d] drivers", Plaintiff Greene's Complaint alleged the following four causes of action:

> [1] Failure to pay for all hours worked: violation of NRS 608.016 and State and Federal minimum wage laws.  (Citing Section 6 of the Fair Labor Standards Act, 29 U.S.C. § 206, NRS 608.016 and Sections 16 and 16A of Article 15 of the Constitution of the State of Nevada);
>
> [2] Failure to pay for overtime.  (Citing NRS 608.100(1)(b) and Section 7(a)(1) of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1) and distinguishing the exceptions in 29 U.S.C. § 213(b)(1) and (17) because "Plaintiff and members of the limousine driver class (1) are not employees with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935 [49 USCS § 31502] and (2) are not drivers employed by an employer engaged in the business of operating taxicabs.");
>
> [3] Liquidated damages.  (Citing 29 U.S.C. §216(b) as providing that "Any employer who violates the provisions of section 6 or section 7 of this Act (29 USCS §§ 206 or 207) shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."); and
>
> [4] Waiting penalties.  (Citing NRS 608.040).

**See Complaint [Doc. #1] at ¶¶ 34-65.**  Greene brought this action seeking certification under both Federal Rule of Civil Procedure 23 (opt out class) and the Fair Labor Standards Act (hereinafter also referred to as the "FLSA") 29 U.S.C. § 216(b) collective action (opt in class).  **Id.** at **¶¶ 32 and 33.**

On May 22, 2009, Plaintiff Samuel Baum *et al.* filed a Complaint (hereinafter the "Baum Complaint") on behalf of seventeen named Plaintiffs[3] (hereinafter the "Baum

---

[3] The named Plaintiffs are (1) Samuel Baum, (2) Sandy Boughner, (3) Brad Clark, (4) Keith Jackson, (5) Allan Douthard, (6) Michael Kaleikin, (7) Joseph Pellegino, (8) Zbigniew Obrycki, (9) Juan Iglesia, (10) Walter Clark, (11) Ivron Mayfield, (12) George Vande Logt, (13) Robert Reed, (14) Paul Lauzen, (15) Troy Smith, (16) Ferenc Zombori, and (17) Jacqueline Thompson.  [Doc. #7 at Exhibit 2]

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

Plaintiffs") against Defendants (1) Alan Waxler; (2) Alan Waxler Group, Inc. dba AWG, Inc.; (3) Alan Waxler Group, LLC; (4) Alan Waxler Group Charter Services, LLC ; (5) AWG Ltd.; (6) AWG Management Company, LLC; and (7) AWG Corporate Events, LLC[4] in the Eighth Judicial District Court of the State of Nevada. **Baum Complaint [Doc. #7 at Exhibit 2] at ¶¶ 1-19.** Unlike Greene's Complaint, however, the Baum Plaintiffs improperly pled for the creation of only a NRCP Rule 23 opt-out class even though they also alleged violations under the FLSA which would require a collective opt-in class under 29 U.S.C. § 216(b). *See* **Baum Complaint [Doc. #7 at Exhibit 2] at ¶ 51 and at Prayer for Relief (a).** As to causes of action, Baum brought claims for:

> [1] State Wage and Hour Violations.   (Citing NRS 608.016; FLSA 20 [sic] USCA [sic] § 201, *et. seq.*; NRS 608.019; NRS 608.020, *et. seq.*; and 608.140);
>
> [2] Equitable Tolling/Estoppel;
>
> [3] Attorney Fees and Costs (Citing NRS 608.140); and
>
> [4] Accounting Against the Defendants.

*See* **Baum Complaint [Doc. #7 at Exhibit 2] at ¶¶ 49-71.**   On May 29, 2009, Baum's Complaint was consolidated into Plaintiff Greene's Complaint. **Order Granting Motion to Consolidate Cases [Doc. #9].**

### 2.   Discovery between the parties.

On September 22, 2010, the parties submitted a Joint Discovery Status Report Pursuant to Court's Order Dated September 8, 2010 [Doc. #49] in which the parties stated that no discovery was completed and that "[n]either Plaintiffs nor Defendants have initiated any discovery."  Based on this report, on October 5, 2010, the Court issued a Scheduling Order stating that discovery was to be complete by February 25, 2011. **Scheduling Order [Doc. #51].**  Discovery was never bifurcated and was; therefore, open for all purposes – including class-wide discovery.

---

[4] Of these Defendants, Plaintiffs voluntarily dismissed Defendant (5) AWG, Ltd. and (6) AWG Management Company, LLC. [Doc. #11 and Doc. #12].

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    On December 29, 2010, the Magistrate Judge granted the Stipulated Amended

2    Discovery Plan and Scheduling Order filed by Plaintiffs extending discovery cutoff to March

3    28, 2011 in order "to accommodate the recent substitution of counsel, Kyle Smith, Esq., on

4    behalf of the Baum plaintiffs." **Stipulated Amended Discovery Plan and Scheduling**

5    **Order [Doc. #65].** As to discovery that was still needed, Plaintiffs stated that "Discovery

6    will be needed on all matters set forth in the Complaints and Answers thereto, in addition to

7    the following subjects: (1) Causation; (2) Damages; and (3) Expert(s) Opinions." *Id.*

8    On January 24, 2011, Defendants provided Plaintiffs with records relating to pay and

9    time for ten of the eighteen named Plaintiffs who were within the statute of limitations

10   period of 2007 through 2009 which were later bates numbered by Plaintiffs as AWG00001-

11   AWG007876, AWG008879, and AWG008926-AWG009028.[5] Additionally, on February 22,

12   2011, Defendants provided responses to Plaintiffs First Set of Interrogatories, Requests for

13   Admission, FRCP 34 Request to Inspect and Request for Production of Documents that

14   included additional documents in the form of AWGCS' Employee Handbook dated January

15   2008, pages 1-46; Employee Handbook dated June 2008, pages 1-46; and the Driver's

16   Manual with Table of Contents, pages 1-54.  These responses were limited to the named

17   drivers within the statute of limitations period of 2007-2009 as no certification motion or

18   equitable tolling had been granted yet.  Out of the eighteen named drivers, only ten were

19   not separated from the company prior to the statute of limitations cutoff in 2007.

20   On May 17, 2011, the Magistrate Judge approved an Amended Discovery Plan and

21   Scheduling Order [Doc. #69] filed by Plaintiffs.  **Amended Discovery Plan and**

22   **Scheduling Order [Doc. #69].** In this Amended Discovery Plan, Plaintiffs again reiterated

23   that "Discovery will be needed on all matters set forth in the Complaints and Answers

24   thereto, which includes the following subjects: (1) Causation; (2) Damages; and (3)

25   Expert(s) Opinions." *Id.* As to the reason for the extension, Plaintiffs stated "The parties

26

27   _____

[5] The exact range of documents properly produced in discovery is in dispute as Plaintiffs

28   attempted to add unproduced documents in their bates range after discovery was closed
     and misrepresent that those documents should be included in discovery.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702 862 8800

continue to engage in coordinated and ongoing discovery.  Because of recent discovery requests and productions, the parties request an amended discovery cut-off date of June 30, 2011."  *Id.*  Discovery was never extended and therefore, <u>discovery in this matter closed on June 30, 2011</u>.

Plaintiffs never (1) filed initial disclosures or disclosed the names of any individuals they intend to use to support their claims; (2) disclosed any documents, electronically stored information, or tangible things that they have in their possession that they intend to use to support their claims; (3) provided a computation of damages for either themselves or for any opt-in plaintiffs; (4) provided an expert report[6]; or (5) took depositions.  Most importantly, Plaintiffs never conducted any discovery into class records for either the collective opt-in class or the Rule 23 opt-out class.

### 3.    Class certification.

Over three years after consolidation of the Greene and Baum Plaintiffs and over nine months after the close of discovery, on April 17, 2012, the Court granted Plaintiffs' renewed Joint Motion for Class Certification under both Federal Rule of Civil Procedure 23 and 29 U.S.C. § 216(b).  **Order Granting Renewed Joint Motion for Class Certification [Doc. #103].**  At the time this Order was issued, however, this Court contemplated that discovery was ongoing or that further discovery would be conducted when it stated:

> At this stage of the proceedings, the court defines the relevant class period broadly, including any possible claims dating to 2003. Nevertheless, defendants may later move to "prune" the relevant class period once "discovery is complete and the case is ready for trial." *Edwards*, 467 F. Supp. 2d at 990 n.1. (describing the second step of the collective action certification analysis whereby the party opposing collective action treatment may move to decertify the class).

---

[6] On December 27, 2010, Plaintiff Robert Greene did provide a Designation of Expert Witness that merely stated: "Glen Pannenborg, 1 Congress Street #A7, Jersey City, NJ, 07307 (201) 984-4554.  Mr. Pannenborg will testify as to the number of class members, the records provided by Defendant regarding each class member, the trip tickets related to each class member, overtime worked by class members, the types of trips and vehicles driven by class members, estimated damages."  This notice does not properly identify an expert witness and Plaintiffs have never supplemented this notice with a written report as required by Rule 26(a)(2).

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   *Id.* at 5:15-20. As stated in its Order, the Court contemplated a later "stage of proceedings"

2   once discovery was complete and the case was actually ready for trial whereby Defendants

3   could prune the class period. *Id.*

4               **4.**      **Plaintiffs' closure of discovery.**

5        After the April 17, 2012 Order Granting Renewed Joint Motion for Class Certification

6   [Doc. #103] was issued but before the October 11, 2012 Order Approving FLSA and Class

7   Notice [Doc. #112] was issued, Defendants filed a Motion to Reopen Discovery as

8   contemplated by the Court's Order [Doc. #103] granting certification. **Motion to Reopen**

9   **Discovery [Doc. #108].** In its Motion, Defendants requested a new scheduling order be

10   issued as to all dates for the "completion of necessary general, expert, and class-related

11   discovery." *Id.* at 8:21-23.

12        In response, Plaintiffs vehemently opposed any reopening of general discovery and

13   instead argued that only Plaintiffs should be allowed to cure its failure to seek discovery

14   before discovery close. **Response to Motion to Reopen Discovery [Doc. # 109].** On

15   February 12, 2013, the Magistrate Judge agreed with Plaintiffs and denied the Motion to

16   Reopen Discovery. **Minutes of Proceedings [Doc. #121].**

17        By slamming the door shut on any reopening of general discovery, Plaintiffs also

18   made the conscious choice to rely on the ten drivers records that were obtained pre-

19   certification and prior to a class notice. Thus, Plaintiffs closed all discovery before even

20   ascertaining who the opt-in plaintiffs would be. By preventing both sides from conducting

21   any general class discovery, Plaintiffs created the predicament that has now come to Trial

22   – how do Plaintiffs meet their burden of proof for a class in which no class evidence is

23   before the Court? The answer is that Plaintiffs cannot meet this burden and, therefore, no

24   FLSA collective class or Rule 23 class exists.

25               **5.**      **Class Notice.**

26        After reviewing the Plaintiffs' proposed class notice, on October 11, 2012, the Court

27   issued an Order Approving FLSA and Class Notice. **Order Approving FLSA and Class**

28   **Notice [Doc. #112].** In the proposed Class Notice, Plaintiffs' consolidated collective and

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

class claims were stated as:

> Plaintiffs contends [*sic*] that the AWG Defendants' drivers were subject to the common practice, policy, or plan of failing to pay all wages and compensation due as follows:
>
> > • Failing to pay drivers for each and every hour worked as required by Nevada law, including driving time (without passengers), waiting time, preparation time, and other pre- and post-shift activities, including time spent refueling or washing vehicles;
> >
> > • Failing to pay drivers all wages and compensation due at termination of employment (following discharge, quitting, or resignation) as required by Nevada law;
> >
> > • Failing to pay drivers overtime pay (time and one-half) for all hours worked over 40 in a workweek as required under the federal FLSA; and
> >
> > • Failing to pay drivers minimum wages for every hour worked as required under Nevada law and the federal FLSA.
>
> Plaintiffs also seek liquidated damages under the FLSA in an amount equal to the alleged unpaid minimum wages and overtime (i.e., double damages).   In addition, Plaintiffs seek attorneys' fees, costs, and interest.

***Id.* at Exhibit A at pp. 2-3.**  Thus, in their Class Notice, Plaintiffs abandoned any allegation for meals and rest under NRS 608.019.  Further, the Class Notice defined the "Composition of the Classes" as follows:

> a) Nevada Class: All current and former drivers employed by the AWG Defendants in the State of Nevada from 2003 to the present.
>
> b) FLSA Class: All current and former drivers employed by the AWG Defendants from 2003 to the present excluding those employees over whom the Secretary of the U.S. Department of Transportation has power to establish qualifications and maximum hours of service rules pursuant to the Motor Carrier Act of 1935.

***Id.* at Exhibit A at p. 3.**  Accordingly, the classes were to include all drivers with the express exclusion of drivers subject to the Federal Motor Carrier Act of 1935.  ***Id.***  Although the Court allowed equitable tolling beyond the FLSA's two-year statute of limitation (which

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1   would have limited the action to drivers from 2007 through 2009) up through 2003, the

2   Court did so with the understanding that this class period would be shortened later once

3   discovery had been complete. **See Order Granting Renewed Joint Motion for Class**

4   **Certification [Doc. #103] at 5:15-20.** Specifically, the Court held:

5              At this stage of the proceedings, the court defines the relevant
            class period broadly, including any possible claims dating to
6            2003. Nevertheless, defendants may later move to "prune" the
            relevant class period once "discovery is complete and the case
7            is ready for trial." *Edwards*, 467 F. Supp. 2d at 990 n.1.
            (describing the second step of the collective action certification
8            analysis whereby the party opposing collective action treatment
            may move to decertify the class).
9

10  *Id.* Accordingly, the broader 2003 class period was to allow for Plaintiffs' broad discovery

11  only, which they never performed, and was never meant to be the final class period at trial.

12          Additionally, as part of its October 11, 2012 Order Approving FLSA and Class

13  Notice, this Court specifically ordered:

14             When the notice period ends, Administrator shall prepare a list
            of those people who timely returned consent to join forms,
15            stating their full names, the date on which each consent to join
            form was received, and the postmarked date on the
16            corresponding envelope, if applicable. Plaintiff's counsel shall
            file that list and all timely consent to join forms with the Court
17            within 14 days of the end of the notice period.

18  (Emphasis added). **See Order Approving FLSA and Class Notice [Doc. #112] at ¶ 10.**

19  According to Plaintiffs, the "sixty-day (60) class notice period commenced on November 7,

20  2012, and ended on January 7, 2013." **Class Plaintiffs' Status Report & Request for**

21  **Trial Setting [Doc # 116] at 2:14-16.**

22          **6.     Plaintiffs' failure to file Consents to Join.**

23          As stated above, pursuant to this Court's Order [Doc. #112], "Plaintiffs' counsel" was

24  required to file "all timely consent to join forms with the Court within 14 days of the end of

25  the notice period." **See Order Approving FLSA and Class Notice [Doc. #112] at ¶ 10.**

26  Thus, the deadline to file Consent to Join forms was January 22, 2013 (given that the 14th

27  day required by the Order [Doc. #112] fell on the Martin Luther King, Jr. Day holiday on

28  January 21, 2013). Rather than complying with this Order, on January 23, 2013, Plaintiffs

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

1    filed a "Status Report" that did not contain any Consent to Join forms. **Class Plaintiffs'**

2    **Status Report & Request for Trial Setting [Doc # 116]**. Instead, in their untimely filing,

3    Plaintiffs attached a list of consents without the actual Consents to Join. *Id.* This is the

4    equivalent of the "Do Nothing" option in the Class Notice that state that the "Legal Effect" of

5    this option is "You [Putative Class Member] will <u>not</u> be part of the FLSA Class, but will still

6    be part of the Nevada Class." *See Order Approving FLSA and Class Notice [Doc. #112]*

7    **at Exhibit A at p. 2.** In a clear effort to misrepresent their failure to file the Consents to

8    Join, Plaintiffs attached their Consents to Join nearly a year and a half later as an exhibit to

9    their May 23, 2014 Reponse to Motion to Decertify. **Reponse to Motion to Decertify**

10   **[Doc. #188-4.2].**

11        To date, the only "Consent" ever filed was a pre-certification "Consent to Sue" by

12   Plaintiff Greene on January 29, 2010. **Notice of Filing of Consents to Joinder [Doc.**

13   **#33].** Plaintiffs' counsel failed to comply with a Court Order and no timely Consents to Join

14   the FLSA Class were filed. Therefore, there is no collective class for FLSA claims that has

15   ever properly opted into the litigation.

16             **7.**     **Pretrial and trial.**

17        In their Joint Pretrial Order, Plaintiffs have retained their claims and class definitions

18   from the Order Approving FLSA and Class Notice [Doc. #112]. **Joint Pretrial Order [Doc.**

19   **# 161] at 3:9-17.** Thus, at trial, Plaintiffs seek to prove the following claims:

20            • Failing to pay drivers for each and every hour worked as
21              required by Nevada law, including driving time (without
                passengers), waiting time, preparation time, and other pre- and
22              post-shift activities, including time spent refueling or washing
                vehicles;

23            • Failing to pay drivers all wages and compensation due at
24              termination of employment (following discharge, quitting, or
                resignation) as required by Nevada law;

25            • Failing to pay drivers overtime pay (time and one-half) for all
26              hours worked over forty (40) hours worked in a workweek as
                required under the federal FLSA; and

27            • Failing to pay drivers minimum wages for every hour worked
             as required under Nevada law and the federal FLSA.
28

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

*Id.* Additionally, Plaintiffs seek "damages for wages and compensation due under Nevada law and the FLSA, including liquidated damages under the FLSA and attorneys' fees, costs, and interest." *Id.* at **2:17-20.** At trial, Plaintiffs propose that the class is defined as:

> **Nevada Class:** All current and former drivers employed by the AWG Defendants in the State of Nevada from 2003 to the present.
>
> **FLSA Class:** All current and former drivers employed by the AWG Defendants from 2003 to the present excluding those employees over whom the Secretary of the U.S. Department of Transportation has power to establish qualifications and maximum hours of service rules pursuant to the Motor Carrier Act of 1935.

*Id.* at **3:22-4:4.**

As stated, Plaintiffs' only conducted limited written discovery concerning the eighteen named Plaintiffs prior to certification and prior to a Class Notice being sent. In that timeframe, Defendants only needed to produce records for ten of the eighteen named Plaintiffs as no other Plaintiffs were within the 2007 through 2009 statute of limitations period. Plaintiffs locked themselves into these eighteen Plaintiffs when they closed the possibility of reopening discovery. Accordingly, what is before the Court is not a collective and class action case and instead, are eighteen consolidated single-plaintiff cases or alternatively, a collective and class action that has been pruned to eighteen Rule 23 class members with no collective opt-ins.

Plaintiffs have not listed any drivers from their alleged list of opt-ins and have only listed drivers from the eighteen named Plaintiffs as trial witnesses. **See Joint Pretrial Order [Doc. # 161] at 10:23-11:28.** Plaintiffs have not identified any documents for any specific driver other than the eighteen named Plaintiffs in the trial exhibits. **See Joint Pretrial Order [Doc. # 161] at 9:3-10:22.** In fact, of their identified trial witnesses, Plaintiffs only intend to call thirteen of their eighteen named Plaintiffs. *Id.* at **10:23-11:28.** Thus, it appears that even in their consolidated eighteen-member single-plaintiff case, Plaintiffs are about to jettison five of those plaintiffs and reduce the case to a consolidated thirteen-member single-plaintiff case.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   Plaintiffs cannot litigate a collective and class action matter before this Court where
2   they have no consenting opt-in class members, no class records and no expert who could
3   possibly extrapolate from records of ten named plaintiffs.  This trial should not and cannot
4   proceed as a FLSA collective or Rule 23 class claims and should proceed as a
5   consolidated eighteen-member single-plaintiff case.

6   **III.    LEGAL ARGUMENT**

7   **A.    This Case Should Be Decertified At Trial And Proceed As A Consolidated Eighteen-Member Single-Plaintiff Case Because There Is No Representative Evidence For Class Members And There Is No Possible Class-wide Resolution.**

9   The Court should decertify the class because Plaintiffs cannot satisfy their burden to
10  show they have common contentions capable of class-wide resolution under Rule 23, or
11  that they are similarly situated under the FLSA.  This matter is no longer in the early
12  certification stage upon which Plaintiffs can cite to what class members will potentially
13  testify to or what class records or an expert will potentially show.  Discovery is closed and
14  this matter is now at trial.  There are no opt-in or opt-out class members identified as trial
15  witnesses beyond the original named Plaintiffs who have not filed Consents to Join.  There
16  are no class records beyond the original limited records for ten named Plaintiffs who fell in
17  the 2007-2009 statute of limitations period.  There are no experts who could statistically
18  extrapolate any liability or damages for the class members.  Therefore, Plaintiffs have
19  absolutely __no evidence__ regarding the putative class or any way to present class
20  representative evidence at trial.[7]

21  **1.    Decertification at trial is proper because Plaintiffs have no representative evidence that would allow class-wide resolution.**

23  As a threshold matter, this Court can decertify this matter at any time during trial
24  before a final judgment on the merits is entered.  The United States Supreme Court has
25  held that a district court remains free to modify a certification order after it has been entered

---

26
27  [7]    As to the dearth of class evidence, Magistrate Judge Koppe previously held [Doc #171], without reservation, that Plaintiffs unjustifiably failed to make initial disclosures by not identifying any witnesses or documents which allegedly support their claims and by not providing a calculation of damages.
28

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    in the light of subsequent developments in the litigation. *Gen. Tel. Co. of the Southwest v.*

2    *Falcon*, 457 U.S. 147, 160 (1982). Such an order "is inherently tentative" and this flexibility

3    enhances the usefulness of the class-action device. *Id.* Further, the certification of a class

4    under Federal Rule of Civil Procedure 23 does not conclusively determined the disputed

5    question of whether class treatment is appropriate because the district court may revise its

6    decision on that issue. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978). Similarly,

7    the Ninth Circuit has stated that "before entry of a final judgment on the merits, a district

8    court's order respecting class status is not final or irrevocable, but rather, it is inherently

9    tentative." *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 633 (9th Cir. 1982)

10    *citing General Telephone Co.* and *Coopers & Lybrand* at 469 n.11.

11        A District Court in the Fifth Circuit applied this analysis to revisit the issue of

12    decertification and to decertify a FLSA collective action at the close of a bench trial.

13    *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 572 (E.D. La. 2008). In *Johnson*,

14    the court noted that "all of the factual issues did not come to the fore until after the Court

15    reviewed all of the evidence presented by the parties" and that "the record developed

16    through trial brought into clearer relief how problematic collective adjudication of this matter

17    is, necessitating fresh consideration." *Id.* Citing the Fifth Circuit's holding in *Richardson v.*

18    *Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983), the Johnson Court held that a district court is

19    "charged with the duty of monitoring its class decisions in light of the evidentiary

20    development of the case. The district judge must define, redefine, subclass, and decertify

21    as appropriate in response to the progression of the case from assertion to facts." *Johnson*

22    at 572. Although *Richardson* made its observation in the context of Rule 23, the *Johnson*

23    Court found that the same principles were "equally applicable" in a FLSA collective action

24    as both litigation devices operated "to resolve the claims of many individuals based on

25    representative evidence." *Id.* Thus, "consistent with its duty to manage this litigation

26    according to evolving factual developments" the *Johnson* court revisited the issue of

27    decertification at trial and ultimately ruled that the matter should be decertified. *Id.* at 571

28    and 588.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    Courts have found that decertification during trial is appropriate when plaintiffs

2  proffering of representative class evidence is flawed.  In *Johnson v. Big Lots*, the plaintiffs

3  of a FLSA collective class alleged that there was a uniform policy or practice of

4  misclassifying assistant store managers (also known as "ASMs") as exempt from overtime

5  pay.  *Johnson* at 579.  At trial, however, plaintiffs produced no direct evidence of a

6  conscious corporate intention to deny ASMs managerial responsibilities.  *Id.*  Instead,

7  plaintiffs offered proof "largely of individual employment circumstances through survey

8  responses and witness testimony."  *Id.*  Although opt-in plaintiffs testified at trial, their

9  characterizations of day-to-day work activities presented through trial "erased the court's

10  earlier understanding that plaintiffs were similarly situated."  *Id.*  Thus, the Johnson court

11  determined that the "representative" testimony was not representative of the collective

12  action plaintiffs' experiences.  *Id.*

13    In a recent 2014 wage and hour class action entitled *Duran v. U.S. Bank National*

14  *Association*, the California Supreme Court reviewed a trial court's flawed implementation of

15  sampling to determine whether or not class members were exempt.  *Duran v. U.S. Bank*

16  *National Association*, S200923 (May 29, 2014).  In *Duran*, plaintiffs brought a class action

17  for improperly classifying business banking officers (also known as "BBOs") as overtime

18  exempt.  *Id.* at 3.  The trial court attempted to use 21 BBOs' testimony about work habits to

19  represent a sample of the 260 plaintiffs in the class.  *Id.* at 1.  Even with two plaintiffs'

20  experts opining on projecting the sample to the whole class, the California Supreme Court

21  found the resulting sampling to be biased in plaintiffs' favor and containing errors. Id. at 11,

22  40-45.  The court noted that sampling is based on inferential statistics and noted that the

23  Fifth Circuit held that the essence of inferential statistics is that "one may confidently draw

24  inferences about the whole from a representative sample."  *Id.* at 36 *citing In re Chevron*

25  *U.S. A., Inc.*, 109 F.3d 1016, 1019-1020 (5th Cir. 1997).  The sampling used in *Duran*,

26  however, was flawed because in addition to being too small and containing large margins

27  of errors, the selection of representative plaintiffs were skewed because the sample did not

28  include plaintiffs with weak cases who could be encouraged to opt-out of the litigation.  *Id.*

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702 862 8800

at 43-44. Thus, with reduced opt-out members, the sampling results would be skewed in plaintiffs' favor. *Id.* at 45. Therefore, the court held a trial plan that relies on statistical sampling "must be developed with expert input and must afford the defendant an opportunity to impeach the model or otherwise show its liability is reduced" to avoid being "profoundly flawed." *Id.* at 2.

In this matter, the Court is faced with a similar dilemma that was presented in *Johnson* and *Duran*. Like in *Johnson*, Plaintiffs do not have any direct evidence of a conscious corporate intention behind the alleged misclassification of drivers because no discovery was ever conducted as to why Defendants believed that drivers were exempt and each defense is individualized based on the type of work each driver performed. Further, each driver has individualized hours and rates of pay that differ from each other and determine whether or not that individual was properly paid minimum wage or worked any overtime. In *Johnson*, however, the plaintiffs presented a survey of all opt-in plaintiffs about their job duties conducted by two retained experts and presented the testimony of 20 depositions as representative proof for the collective class. *Id.* at 579-583. Here, plaintiffs have no survey or any other representative proof that could show that the eighteen named Plaintiffs will provide any evidence that is representative of the entire proposed class. Of the ten drivers who were within the 2007 through 2008 statute of limitations period, only five drivers have any significant time and pay records. Even among those five, there is no common or similar pattern of hours, pay or vehicles driven that would allow a common answer as to liability for minimum wage, liability for overtime and which exemptions apply.

Here, like in *Duran*, Plaintiffs may argue for a sample of drivers to be used to draw inferences for the entire class. Unlike in *Duran*, however, Plaintiffs have no experts to input on such sampling. Further, any such results would be impermissibly biased as all thirteen of Plaintiffs' designated witnesses are drawn completely from the eighteen named Plaintiffs. Clearly, like the opt-ins in *Duran*, the named Plaintiffs in this matter do not comprise a representative sample of all drivers in the class as the named Plaintiffs who filed the litigation are most likely to believe they have the best claims amongst the class. In *Duran*,

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

the sample included opt-outs but not in a representative scale.  Here, however, the entire sample would exclude all opt-outs and only be comprised of named Plaintiffs.  Therefore, there is no evidence or testimony that Plaintiffs could present as a truly representative sample of the entire class.

### 2. Decertification at trial is proper because Plaintiffs' failure to gather class evidence does not meet the rigorous *Dukes* analysis or the FLSA.

Under the landmark *Wal-mart v. Dukes* case, the relevant inquiry under Rule 23 is whether a class-wide proceeding would generate common answers capable of resolving the entire litigation or whether there are dissimilarities with the proposed class that impede such common answers.  *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. ____, 131 S. Ct. 2541, 2551-56 (2011).  The inquiry is largely the same under the FLSA, where "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).   Thus, for example, claims that individual plaintiffs performed work off-the-clock, to varying degrees, for which they were allegedly not paid are often insufficient to survive decertification. *See, e.g., O'Brien v. Ed Donnelly Enters., Inc.*, 2006 WL 3483956, at *4 (S.D. Ohio 2006). Moreover, the mere fact that plaintiffs have common allegations is insufficient where the basis to support such allegations arises out of different fact patterns. *Dukes*, 131 S. Ct. at 2556-57; *Smith v. T-Mobile USA, Inc.*, 2007 U.S. Dist. LEXIS 60729, *14-15 (C.D. Cal. Aug. 15, 2007).

At the decertification stage, Plaintiffs "bear the 'heavier burden' of showing that they are similarly situated." *Smith*, 2007 U.S. Dist. LEXIS 60729, at *12 (citing *Anderson*, 488 F.3d at 953).  Plaintiffs' burden is heavier at this stage because discovery is complete and the matter is ready for trial, giving the court "a much thicker record . . . to make a more informed factual determination of similarity . . . ." *Rodriguez*, 2012 U.S. Dist. LEXIS 172791, at *11 (citing *Morgan*, 551 F.3d at 1261).  However, as discussed immediately below, Plaintiffs have no more evidence now than they had when the case was certified,

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    and that evidence is entirely insufficient to satisfy their burden.

2    At trial, Defendants will show that even amongst the records of the five named

3    Plaintiffs, which do not come close to meeting the numerosity requirements of a Rule 23

4    class, there are dissimilarities amongst the Plaintiffs that go directly to liability, damages

5    and Defendants' defenses. Each named Plaintiff worked a variety of hours that varied each

6    day based on each driver's individual preferences, type of assignments and the available

7    work. Some drivers drove coaches a majority of the time, all of which exceeded 14,000

8    pounds and could result in an eight-hour shift of shuttle activities. Other drivers drove

9    sedans or SUVs of three or six-passenger capacity or limousines of eight-passenger

10   capacity or more and could work less than eight-hours yet be paid for more than eight

11   hours due to minimum billable hour rates. Other drivers did some combination of coaches

12   and limousines that had no set pattern and would vary week to week and day to day. The

13   differences in schedules and vehicles directly impacts whether or not each driver earned

14   minimum wage, worked what would be considered overtime hours and which vehicle-based

15   or occupation-based exemptions apply.

16   At trial, Defendants will also show that clock-in times reflect that different drivers

17   came in at different times relative to the beginning of their shifts. Some drivers were more

18   consistent their clock-in in relation to the start of their shift, such as clocking in

19   approximately 45 minutes prior to shift, while others varied day by day depending on

20   individual preferences and the nature of the reserved trip and could clock in less than

21   minutes prior to their first trip or even after their first trip was scheduled. Some drivers

22   remained on duty for their entire shift while others recorded their "off-duty" time in the

23   middle of their shift in which they were not required to be available for work. These

24   differences in clock-in times affected each drivers' total hours worked for the purposes of

25   calculating minimum wage and whether or not any alleged overtime was even worked.

26   As mentioned above, there is an inherent deficiency in establishing common

27   contentions of *all* potential class members from the evidence of only the named Plaintiffs.

28   The *Dukes* Court has already unequivocally rejected this approach to representative

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

litigation – labeling it the "Trial By Formula" approach and dismissing it as a "novel project." *Dukes*, 131 S. Ct. at 2561.  Plaintiffs simply cannot demonstrate common contentions by presenting only samples of evidence from a few named Plaintiffs.  *Id.*  Such a shortcut denies due process to AWG and, for that reason, was unquestionably disapproved by the Supreme Court.  *Id.*

As stated, Plaintiffs have only a small sampling of evidence from five named Plaintiffs and no evidence from the class.  Even in this sampling, the evidence so fraught with dissimilarities and inconsistencies that neither *Dukes* nor the FLSA can be satisfied.  In short, Plaintiffs are, in a sense, their own worst enemies as their efforts to limit the universe to prevent decertification has acted as a double-edged sword and also vitiated Plaintiffs' own ability to present class evidence.

### 3.    Decertification at trial is proper because the Defendants have individualized defenses.

Decertification is also proper where there are no common answers with regard to the defenses applicable to Plaintiffs' claims.  Thus, a collective action should not be permitted where "serious concerns about due process" necessarily arise as a result of forcing an employer to rely upon representative proof to defend its position when its defenses are individual and not susceptible to support through representative proof.  *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008); *see also Dukes*, 131 S. Ct. at 2560.  Defendants "could be potentially prejudiced by a jury painting with a broad brush" in a collective action if jurors inaccurately assume all plaintiffs suffered the same injury in the same way and can be recompensed in a single stroke where such is not the case.  *See Duncan v. Phoenix Supported Living, Inc.*, 2007 WL 1033360, *9 (W.D.N.C. Mar. 30, 2007).  Thus, decertification is necessary where the defenses to plaintiffs' claims require the court to conduct detailed individualized inquiries into each plaintiff, such as whether or not the particular employee in fact ever worked overtime hours.  *King v. West Corp.*, 2006 WL 118577, *47 (D. Neb. Jan 13, 2006) (decertifying a class in part because defendant intended to offer individualized defenses regarding whether uncompensated work occurred,

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    whether time spent performing such work was *de minimis*, and whether the plaintiffs had

2    scheduling flexibility and noting "[d]isparate individual defenses heighten the individuality of

3    the claims, and requiring the defendant to raise these arguments in a class action suit

4    undermines its ability to mount a clear and coherent defense to the case and significantly

5    complicates trial management").

6         At trial, Defendants intend to present several defenses against liability that are

7    individualized as to the nature of the work conducted.   As to the FLSA and Nevada

8    overtime claims, Defendants will present evidence that the drivers are all exempted under

9    the Motor Carrier Exemption.   Defendants will also present evidence that all drivers are

10   exempt because Defendants employed drivers of small vehicles under 10,001 pounds and

11   with less than 6 passengers in accordance with the FLSA's Taxicab exemption under

12   U.S.C. § 213(b)(17).

13        In addition to the Motor Carrier Exemption and Taxicab Exemption under the FLSA,

14   Defendants have a separate defense to Nevada overtime for just certain drivers through

15   the taxicab and limousine driver exemption under NRS 608.018(j).   This analysis would

16   require an individualized week-by-week inquiry into each drivers operation of coaches that

17   were 10,001 pounds or more, limousines that had 8 passengers (including the driver) or

18   more or sedans and SUVs that had 6 passengers (including the driver) or less.   As the

19   NRS 608.018(j) exemption only applies to taxicab drivers and limousine drivers and not to

20   the entire business, an individualized inquiry as to which drivers qualify would need to be

21   conducted.

22        Additionally, as to the federal and state minimum wage claims, Defendants intend to

23   show at trial that Defendants properly paid the minimum wage for all hours worked.   To do

24   so, however, the Defendants will have to do an individualized inquiry as to each drivers pay

25   rates, clock-in procedures, typical schedules and trip assignments (such as Kellys, charters

26   or shuttles), standard shifts such as those that were 8 hours and those that were 12 hours,

27   hours actually worked, hours within a shift spent off, vehicle changes, alleged off-the-clock

28   work and other factors which varied driver to driver and day to day.   Further, depending on

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

the period of liability, some drivers may have been exempt from minimum wage through the taxicab and limousine exception under NRS 608.250(e) for periods of employment that predate the 2006 Amendment to the Nevada Constitution.  As some named Plaintiffs were employed prior to the 2006 Amendment and others were not, an individualized inquiry would be needed as to the application of this defense as well.

Further, as has been detailed above, approximately only five named Plaintiffs have significant pay and trip records.  Of the remaining eighteen named Plaintiffs, approximately four more have only significant trip records while approximately six named Plaintiffs have no pay or trip records.  Thus, even as to the eighteen named Plaintiffs, different inquiries will be needed as to whether or not Plaintiffs received minimum wage or overtime and what proof will be sufficient for each.

### 4.   Decertification at trial is proper because Plaintiffs' failure to gather class evidence also prevents calculating class damages.

Although individualized questions about calculation of damages by itself does not always defeat certification, in this matter, Plaintiffs' failure to provide a calculation of damages arises from the same failure to conduct class discovery that goes to individualized questions of the Defendants' practices and their defenses.  The *Dukes* Court expressly rejected the notion that a class can proceed without evidence of damages when it held that defendants are "entitled to individualized determinations of each employee's eligibility for [damages]."  *Dukes*, 131 S. Ct. at 2560.  Any attempt to prove damages of all class members by sampling the damages of a group of class members is entirely unacceptable. *Id.*

The failure to provide a damages calculation of alleged unpaid work is fatal to a FLSA collective action.  In *Carmody v. Kan. City Bd. of Police Comm'r*, 713 F.3d 401, 404 (8th Cir. 2013), the court dismissed the plaintiffs' FLSA claims because the plaintiffs did not provide information as to their damages until well after discovery closed, when they submitted affidavits containing "estimations" of hours owed in their response to defeat summary judgment.  *Carmody*, 713 F.3d at 404.  The court excluded these affidavits even

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1    though it recognized that doing so was "tantamount to dismissal." *Id.* The Eighth Circuit

2    upheld the district court's decision because without the affidavits the plaintiffs could not

3    prove the existence of damages. *Id.*

4          Here, as in *Carmody*, the named Plaintiffs have failed to produce any evidence

5    related to their damages.  Moreover, no information, evidence or calculation has been

6    provided with respect to the putative class.  In fact, Plaintiffs have absolutely no records to

7    even identify putative class members let alone sufficient to establish the days or times

8    worked by the same class they seek to represent.  Although Plaintiffs have some records

9    for five named Plaintiffs, these records do not explain how much of Plaintiffs time or pay

10   that Plaintiffs believe was exempt, especially given the careful pleading around exemptions

11   in Plaintiffs' Complaint.  It is clear that Plaintiffs' plan for proving up damages at trial will be

12   based on the presumption that every class member was deprived of the same amount of

13   wages for the same amount of hours worked (which is not true).  This "presumption"

14   offends the tenets of class action jurisprudence outlined above. *Dukes*, 131 S. Ct. at 2560.

15   Accordingly, Plaintiffs lack sufficient evidence to demonstrate that a class-wide proceeding

16   would generate common answers apt to drive the resolution of their claims.

17         Plaintiffs only alternative to their lack of class evidence is to present some sort of

18   expertless extrapolation at trial.  Courts in this Circuit have held that in a Rule 23 class, it is

19   improper to rely on "representative testimony where plaintiffs have provided no reliable

20   means of extrapolating that testimony to the class as a whole." *Cruz v. Dollar Tree Stores,*

21   *Inc.*, 2011 WL 2682967 *5 (N.D. Cal. July 8, 2011).  Additionally, "plaintiffs must be able to

22   show that their damages stemmed from the defendant's actions that created the legal

23   liability." *Leyva v. Medline Indus.*, 716 F.3d 510, 511-514 (9th Cir. 2013).  In this regard,

24   the Ninth Circuit determined that "damages w[ould] be calculated based on wages each

25   employee lost due to [defendant's] unlawful practices" using payroll and time-keeping

26   databases which would "enable the court to accurately calculate damages and related

27   penalties for each claim." *Id.* at 514.  Thus, while not always requiring an exact accounting

28   for each individual class member, plaintiffs will be "required at trial to present <u>concrete</u> and

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

reliable methods for determining liability and damages." *Arredondo v. Delano Farms Co.*, 2014 WL 710945, at *55 (E.D. Cal. Feb. 21, 2014) (emphasis added). In this matter, Plaintiffs cannot present a "concrete and reliable" method for extrapolation of damages. Therefore, Plaintiffs will be unable to meet their burden to prove class-wide damages at trial.

### B. Plaintiffs' Claims Under The FLSA Are Time Barred Because Plaintiffs Failed To File Consents To Join.

The FLSA provides that "[n]o employee shall be a party plaintiff to any [collective] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); *Partlow v. Jewish Orphans' Home of S. Cal., Inc.*, 645 F.2n 757, 760 (9th Cir. 1981) (the FLSA statute of limitations continues to run until a valid consent is filed); *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp.2d 1129, 1139-1140 (D. Nev. 1999) (granting summary judgment against plaintiffs that did not file a consent to sue within the FLSA limitations period).

In this matter, the Court approved notification of this suit to potential class members in April of 2012. **[Doc. #103].** No Plaintiffs filed a consent to sue within the period required in that Order. Although Plaintiff Robert Greene, filed a consent to sue, it too is invalid as it was premature and predated the Class Notice by nearly three years. **Notice of Filing of Consents to Joinder [Doc. #33].** Thus, there is no collective class for FLSA claims that has ever properly opted into the litigation.

Additionally, the statute of limitations under the FLSA for violations of minimum wage and/or overtime provisions is two years; three years for a willful violation. 29 U.S.C. § 255. As a matter of law, the statute of limitations continued to run and was not tolled as to the putative class members and named plaintiffs other than Plaintiff Roger Greene until May 23, 2014. Therefore, Plaintiffs' claims for minimum wage and overtime violations under the FLSA occurring prior to May 23, 2011 are barred with respect to willful violations and claims for minimum wage and overtime violations under the FLSA occurring prior to May 23, 2012 are barred with respect to non-willful violations.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

C.   **Plaintiffs' Claims Fail Because Defendants Have Complete Defenses To Each Cause Of Action.**

Under Federal Rule of Civil Procedure 52, Defendants may move for judgment as a matter of law during a nonjury trial.  As in *Johnson*, Defendants believe that this Court will agree that the granting of a JMOL motion will be warranted once this Court observes the "more fully developed factual record presented at trial."  *Johnson* at 571.  The following claims will be ripe for judgment as a matter of law upon the Court's hearing of the issues involved in these claims:

1.   **This Court should dismiss Plaintiffs' claim for a violation of NRS 608.016 as a matter of law because there is no private right of action for such a claim.**

Plaintiffs assert causes of action for violation of NRS 608.016 in the First Cause of Action in the *Greene* Complaint and First Cause of Action in the *Baum* Complaint.  NRS 608.016 provides "[a]n employer shall pay to the employee wages for each hour the employee works.  An employer shall not require an employee to work without wages during a trial or break-in period."

Recent cases have held that there is no cause of action for NRS 608.016.  In *McDonagh*, this Court noted that the "current tide of common law appears to show that NRS 608.140 'does not imply a private remedy to enforce labor statutes, which impose external standards for wages and hours,' but only provides private rights of action for contractual claims."  *McDonagh et al. v. Harrah's Las Vegas, Inc. et al.*, 2014 U.S. Dist. LEXIS 82290 *9-10 (D. Nev. June 17, 2014) *quoting Descutner v. Newmont USA Ltd.*, 3:12-cv-00371-RCJ-VPC, 2012 WL 5387703, *2 (D. Nev. 2012).  In so finding, this Court explained that "NRS 608.180 charges the Nevada Labor Commissioner with enforcement of NRS 608.005 – 608.195, which this court finds persuasive to imply that no private rights of action exist for the included statutes."  *McDonagh* at *10.  Accordingly, the Court dismissed the third, fifth and sixth causes of action which encompassed "(3) violations of NRS 608.016, 608.030, and 608.140, . . . (5) failure to pay overtime wages in violation of

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

1    NRS 608.140 and 608.018, and (6) failure to timely pay all wages due and owing upon

2    termination pursuant to NRS 608.140 and 608.020-.050." *Id.* at *2 and *10.

3         In this matter, Plaintiffs claim for NRS 608.018 is barred as a matter of law as there

4    is no private right of action under *McDonagh*.  Accordingly, this Court should dismiss the

5    cause of action for NRS 608.016.

6              2.    **This Court should dismiss Plaintiffs' claim for a violation of NRS
                     608.100 as a matter of law because there is no private right of**
7                    **action for such a claim.**

8         Plaintiffs assert a cause of action for violation of NRS 608.100(1)(b) in the Second

9    Cause of Action in the *Greene* Complaint.  NRS 608.100(1)(b) provides, "[i]t is unlawful for

10   any employer to. . . (b) Pay a lower wage, salary or compensation to an employee than the

11   amount that the employer is required to pay to the employee by virtue of any statute or

12   regulation or by contract between the employer and the employee".

13        As held in *McDonagh*, NRS 608.180 charges the Nevada Labor Commissioner with

14   enforcement of NRS 608.005 – 608.195, which this court finds persuasive to imply that no

15   private rights of action exist for the included statutes.   *McDonagh* at *10.   Therefore, this

16   Court should hold that Plaintiffs may not assert a private cause of action for violation of

17   NRS 608.016. *McDonagh* at *2-10.

18             3.    **This Court should dismiss Plaintiffs' claim for a violation of NRS
                     608.019 as a matter of law because there is no private right of**
19                   **action for such a claim.**

20        Plaintiffs assert a cause of action for violation of NRS 608.019 in the First Cause of

21   Action in the *Baum* Complaint.  NRS 608.019 provides in relevant part:

22             1.   An employer shall not employ an employee for a continuous
               period of 8 hours without permitting the employee to have a
23             meal period of at least one-half hour. No period of less than 30
               minutes interrupts a continuous period of work for the purposes
24             of this subsection.

25             2.   Every employer shall authorize and permit all his or her
               employees to take rest periods, which, insofar as practicable,
26             shall be in the middle of each work period. The duration of the
               rest periods shall be based on the total hours worked daily at
27             the rate of 10 minutes for each 4 hours or major fraction thereof.
               Rest periods need not be authorized however for employees
28             whose total daily work time is less than 3 and one-half hours.

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

35.

Authorized rest period shall be counted as hours worked, for which there shall be no deduction from wages.

As held in *McDonagh*, NRS 608.180 charges the Nevada Labor Commissioner with enforcement of NRS 608.005 – 608.195, which this court finds persuasive to imply that no private rights of action exist for the included statutes. *McDonagh* at *10. Therefore, this Court should hold that Plaintiffs may not assert a private cause of action for violation of NRS 608.019. *McDonagh* at *2-10.

> **4.    This Court should dismiss Plaintiffs' claim for a violation of NRS 608.020 as a matter of law because there is no private right of action for such a claim.**

Plaintiffs assert a cause of action for violation of NRS 608.020 in the First Cause of Action in the *Baum* Complaint.   NRS 608.020 provides, "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

As held in *McDonagh*, NRS 608.180 charges the Nevada Labor Commissioner with enforcement of NRS 608.005 – 608.195, which this court finds persuasive to imply that no private rights of action exist for the included statutes. *McDonagh* at *10. Therefore, this Court should hold that Plaintiffs may not assert a private cause of action for violation of NRS 608.020. *McDonagh* at *2-10.

> **5.    This Court should dismiss Plaintiffs' claim for a violation of NRS 608.040 as a matter of law because there is no private right of action for such a claim.**

Plaintiffs assert a cause of action for violation of NRS 608.040 in the Second Cause of Action in the *Greene* Complaint.   NRS 608.040 provides:

> 1.    If an employer fails to pay:
>
> > (a) Within 3 days after the wages or compensation of a discharged employee becomes due; or
> >
> > (b) On the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit or was discharged until paid or for 30 days, whichever is less.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1    As held in *McDonagh*, NRS 608.180 charges the Nevada Labor Commissioner with

2    enforcement of NRS 608.005 – 608.195, which this court finds persuasive to imply that no

3    private rights of action exist for the included statutes.  *McDonagh* at *10.  Therefore, this

4    Court should hold that Plaintiffs may not assert a private cause of action for violation of

5    NRS 608.040.  *McDonagh* at *2-10.

6          **6.    This Court should dismiss Plaintiffs' claim for a violation of NRS
              608.140 as a matter of law because there is no private right of**
7              **action for such a claim.**

8    Plaintiffs assert a cause of action for violation of NRS 608.140 in the First Cause of

9    Action and Third Cause of Action in the *Baum* Complaint.  NRS 608.140 provides,

10          [w]henever a mechanic, artisan, miner, laborer, servant or
             employee shall have cause to bring suit for wages earned and
11           due according to the terms of his or her employment, and shall
             establish by decision of the court or verdict of the jury that the
12           amount for which he or she has brought suit is justly due, and
             that a demand has been made, in writing, at least 5 days before
13           suit was brought, for a sum not to exceed the amount so found
             due, the court before which the case shall be tried shall allow to
14           the plaintiff a reasonable attorney fee, in addition to the amount
             found due for wages and penalties, to be taxed as costs of suit.
15

16    As stated, this Court specifically held that NRS 608.140 "does not imply a private

17    remedy to enforce labor statutes, which impose external standards for wages and hours,"

18    but only provides private rights of action for contractual claims.  *Descutner v. Newmont*

19    *USA Ltd.*, 2012 WL 5387703, *2 (D. Nev. 2012); see also *McDonagh et al., v. Harrah's Las*

20    *Vegas, Inc.*, 2014 U.S. Dist. LEXIS 82290 *9-10 (D. Nev. June 17, 2014).   Therefore,

21    Plaintiffs' claim for violation of NRS 608.140 premised upon an alleged violation of state

22    wage and hour law fails as a matter of law.

23    Plaintiffs' claims for violation of NRS 608.140 additionally fails because even if a

24    private cause of action for recovery of attorney fees under that statute was available,

25    Defendants will show that Plaintiffs failed to make a written demand, at least 5 days before

26    suit was brought, for a sum not to exceed the amount so found due.  Accordingly, Plaintiffs

27    have failed to comply with the statutory requirements of NRS 608.140.

28    / / /

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1

2

3

      **7.**     **This Court should dismiss Plaintiffs' claim for Section 16 of Article 15 of the Constitution of the State of Nevada "Payment of minimum compensation to employees" as a matter of law because Plaintiffs have no evidence of a violation.**

4

5

6

7

8

9

10

11

      Plaintiffs assert a cause of action for a violation of Section 16, Article 15 of the Nevada Constitution (hereinafter also referred to as the "Nevada Minimum Wage Amendment"), in the First Cause of Action of the *Greene* Complaint.[8]  The Nevada Minimum Wage Amendment became effective on November 16, 2016.  Section 16, Article 15 of the Nevada Constitution.  Under the Nevada Minimum Wage Amendment, employers are required to pay employees a minimum wage rate for each hour worked.  *Id.*  The minimum wage rate is lower if the employer offers qualifying health benefits and higher if qualifying health benefits are not offered.  *Id.*

12

13

14

15

16

17

18

19

20

      At trial, Defendants will show that Plaintiffs have not established a violation of the Nevada Minimum Wage Amendment as to absent class members by a preponderance of the evidence.  As stated, Plaintiffs have not offered any evidence as to absent class members establishing the amount of wages paid, the amount of hours worked, the number of days worked sufficient to establish that absent class members were paid less than that required by the Nevada Minimum Wage Amendment.  Moreover, even if a violation of the Nevada Minimum Wage Amendment were proved by a preponderance of the evidence, which it will not, Plaintiffs have not provided any evidence upon which a calculation of damages is possible absent rank speculation.

21

22

23

24

25

      Further, Defendants will show that Plaintiffs were offered qualifying health benefits during the relevant period of time and, thus, were entitled to the lower minimum wage rate provided by the Nevada Minimum Wage Amendment.  Under the Nevada Minimum Wage Amendment, the Nevada Legislature initially set the minimum hour rate at $5.15 per hour

26

27

28

---

[8] Plaintiffs' have not asserted a cause of action for violation of NRS 608.250, which required minimum wage payments to employees for the portion of the class period from 2003 until November 28, 2006.  However, Plaintiffs were not entitled to minimum wage under NRS 608.250 as section (2)(e) provides an exemption for taxi cab and limousine drivers.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

for employers that offered health benefits.   Section 16(A), Article 15 of the Nevada Constitution.   Further, the Nevada Legislature then directly tied the Nevada minimum wage "rate" and its adjustments to the federal minimum wage by stating:

> These rates of wages shall be adjusted by the amount of increases in the federal minimum wage over $5.15 per hour, or, if greater, by the cumulative increase in the cost of living.   The cost of living increase shall be measured by the percentage increase as of December 31 in any year over the level as of December 31, 2004 of the Consumer Price Index (All Urban Consumers, U.S. City Average) as published by the Bureau of Labor Statistics, U.S. Department of Labor or the successor index or federal agency. No CPI adjustment for any one-year period may be greater than 3%.

*Id.*   There is no Nevada case law regarding computation of minimum wage rates under the Nevada Minimum Wage Amendment.   However, by defining Nevada's minimum wage as a "rate[ ] of wage" adjusted by the federal minimum wage, it stands to reason that the Nevada minimum wage would be calculated at the same "rate" of its referenced federal counterpart. Under the FLSA, it is well-established that an employee's hourly rate under the minimum wage is computed on a weekly basis by dividing the total weekly wage paid by the hours actually worked for that week.   *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960); *accord United States Dep't of Labor v. Cole Enters., Inc.,* 62 F.3d 775, 779-80 (6th Cir. 1995).; *Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir. 1986); *Blankenship v. Thurston Motor Lines, Inc.,* 415 F.2d 1193, 1198 (4th Cir. 1969).   Therefore, the proper calculation of Plaintiffs' wage rate will be a weekly calculation under which no minimum wage violations occurred.

Plaintiffs have not established by a preponderance of evidence that the wages received were less than that required by the Nevada Minimum Wage Amendment because (1) for time periods for which records of hours worked and wages paid were established by Plaintiffs a violation was not proven by a preponderance of the evidence; and (2) for time periods for which Plaintiffs have not established evidence of hours worked or wages received by pay period, it is not possible to determine whether a violation exists.   Therefore,

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1    this Court should dismiss Plaintiffs' cause of action under the Nevada Minimum Wage

2    Amendment.

3        **8.    This Court should dismiss Plaintiffs' claim for equitable tolling as**
         **a matter of law because Plaintiffs have insufficient evidence for**
4        **the imposition of equitable tolling.**

5        Plaintiffs assert a cause of action for equitable tolling in the second cause of action

6    of the *Baum* Complaint.  Though the Ninth Circuit has implied a doctrine of tolling into the

7    FLSA, such tolling "concerns itself with the equities of dismissal for untimely filing caused

8    by factors independent of the plaintiff" and only "applies when the plaintiff is prevented from

9    asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary

10   circumstances beyond the plaintiff's control made it impossible to file a claim on time."

11   *Prentice v. Fund for Public Research, Inc.*, 2007 U.S. Dist. LEXIS 71122 at *6-7 (N.D. Cal.

12   September 18, 2007) (citing *Partlow v. Jewish Orphans' Home, Inc.*, 645 F.2d 757, 760 (9th

13   Cir. 1981) (abrogated on other grounds by *Hoffman-La Roche Inc. v. Sperling*, 493 U.S.

14   165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)); *Huynh v. Chase Manhattan Bank*, 465 F.3d

15   992, 1004 (9th Cir. 2006); *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999)); *Sandvik v.*

16   *U.S.*, 177 F.3d 1269, 1271 (11th Cir. 1999).

17       As further guidance, in reference to equitable tolling, one court noted that, "[f]ederal

18   courts have typically extended equitable relief *only sparingly*."   *Gilbert v. Citigroup, Inc.*,

19   2009 U.S. Dist. LEXIS 18981 at *14 (N.D. Cal February 18, 2009) (citing *Irwin v. Dep't of*

20   *Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990)) (emphasis

21   added); *see also*, *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000) (equitable tolling

22   should be "applied sparingly" by the court and operates only in "extraordinary

23   circumstances that are both beyond [the plaintiff's] control and unavoidable even with

24   diligence."); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L. Ed.

25   2d 435 (1990) ("Federal courts have typically extended equitable relief only sparingly.");

26   *Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1330 (8th Cir. 1995) (equitable tolling "is

27   an exception to the rule" to be used only "in exceptional circumstances").   Indeed, as the

28   United States Supreme Court has directed, equitable tolling is "a *rare remedy* to be applied

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1  in *unusual circumstances*." *Wallace v. Kato*, 549 U.S. 384, 396, 127 S. Ct. 1091, 166 L.

2  Ed. 2d 973 (2007) (emphasis added). As stated by another court, "[e]quitable tolling

3  applies only in the 'rare and exceptional circumstance[]." *Smith v. McGinnis*, 208 F.3d 13,

4  17 (2nd Cir. 2000) (citing *Turner v. Johnson*, 177 F.3d 390, 391-92 (5th Cir.), cert. denied,

5  145 L. Ed. 2d 389, 120 S. Ct. 504 (1999).

6      Without extraordinary circumstances or wrongful conduct preventing plaintiff from

7  asserting a claim, equitable tolling must not be applied. Plaintiffs bear the burden of

8  showing the statute of limitations should be equitably tolled, which burden is theirs to bear.

9  *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 (11th Cir. 1993) (holding it is plaintiff's

10  burden to demonstrate equitable tolling is warranted). In fact, due to the doctrine's limited

11  application, a plaintiff bears a heavy burden when seeking to invoke it. *See Kelly v. Eckerd*

12  *Corp.*, No. Civ. A. 03-4087, 2004 WL 614822, at *2 (E.D. Pa. Mar. 11, 2004) (quoting *Griffin*

13  *v. Leaseway Deliveries, Inc.*, Civ. A. No. 89-6522, 1990 WL 136349, at *2 (E.D. Pa. Sept.

14  17, 1990)).

15      At trial, Defendants will show that Plaintiffs do not have any exceptional or

16  extraordinary circumstances warranting equitable tolling. Plaintiffs' evidence thus far of

17  alleged wrongful conduct by AWGCS consists of testimony from Plaintiff Sam Baum that he

18  had personal conversations with management where he was informed AWGCS' pay

19  practices were lawful and one conversation with former AWGCS management employee

20  who told him AWGCS practices were not lawful. Plaintiffs presented no specific evidence

21  of any other plaintiff or putative class member being given incorrect or misleading

22  information by AWGCS. Defendants expect to present evidence contrary to Baum's false

23  representations that any such conversations took place. Therefore, this Court should

24  dismiss Plaintiffs' claim for equitable tolling of the statute of limitations.

25          **9.    This Court should dismiss Plaintiffs' claim for accounting as a
26                  matter of law because Plaintiffs have not established that money
                    damages are an inadequate remedy.**

27      Plaintiffs assert a claim for accounting in the fourth cause of action of the *Baum*

28  Complaint. An accounting is an equitable remedy, not an independent cause of action.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

41.

1    *Western Nevada Supply Co. Profit-Sharing Plan and Trust v. Aneesard Mgmt., LLC*, 2011

2    U.S. Dist. LEXIS 31815 *16-17 (D. Nev. March 24, 2011).   To maintain a suit for an

3    equitable accounting on a cause of action cognizable at law, Plaintiffs must show the

4    accounts between the parties are of such a complicated nature that only a court of equity

5    can satisfactorily unravel them.  *Id.* (internal citations omitted).  In order to prevail upon an

6    equitable claim for inspection and accounting, a plaintiff must establish the existence of a

7    relationship of special trust between the plaintiff and defendant.  *See Mobius Connections*

8    *Group, Inc. v. Techskills, LLC,* 2012 U.S. Dist. LEXIS 7086 *21 (D. Nev. January 23, 2012)

9    *citing Simon v. Bank of America, N.A.*, No. 10-cv-00300-GMN-LRL, 2010 U.S. Dist. LEXIS

10   63480, 2010 WL 2609436 (D. Nev. June 23, 2010).

11        The necessary prerequisite to the right to maintain a suit for an equitable accounting,

12   like all other equitable remedies, is the absence of an adequate remedy at law.  *See Dairy*

13   *queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Dismissal of a claim for accounting is

14   appropriate where a plaintiff does not establish that money damages are an adequate

15   remedy.  *See Singh v. City of Oakland, CA*, 295 Fed. Appx. 118, 121-22 (9th Cir. 2008).

16   An action for accounting is not available where the plaintiff alleges the right to recover a

17   sum certain or a sum that can be made certain by calculation.  *Teselle v. McLoughlin*, 173

18   Cal. App. 4th 156, 179, 92 Cal. Rptr. 2d 696, 715) (2009).

19        In this matter, Plaintiffs have not established that money damages are not an

20   adequate remedy.  Moreover, Plaintiffs claim for an equitable accounting is clearly pursued

21   in order to obtain the discovery they failed to request during the discovery period in this

22   matter and/or as a substitute for adequate calculation of damages.  An equitable suit for

23   accounting is not appropriate when the procedures of discovery exist precisely to allow

24   parties to obtain such information as Plaintiffs seek by way of an accounting.  *See Western*

25   *Nevada Supply Co.,* 2011 U.S. Dist. LEXIS 31815 at *17.  Therefore, Plaintiffs are not

26   entitled to an accounting as a matter of law.

27   / / /

28   / / /

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800                                    42.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**10.     This Court should dismiss Plaintiffs' claim for minimum wage under the FLSA, 29 U.S.C. § 206, as a matter of law because Plaintiffs have not established that minimum wage was not paid.**

Plaintiffs assert a claim for minimum wage under the FLSA, 29 U.S.C. § 206 in the first causes of action in the *Greene* Complaint and the *Baum* Complaint.  The Fair Labor Standards Act of 1938 ("FLSA") established minimum labor standards in order to eradicate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. §202(a); *see also Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1150 (9th Cir. 2000) (quoting *Adair v. City of Kirkland*, 185 F.3d 1055, 1059) (9th Cir. 1999) (internal citations omitted).  Under Section 7 of the FLSA, covered employees which include those engaged in commerce or in the production of goods for commerce, must be paid the minimum wage for each hour worked and must be paid at one and one-half times their regular rate of pay for hours worked in excess of forty in a workweek.  29 U.S.C. §§ 206(a)(1), 207(a)(1).

An exception, however, is that 29 U.S.C. § 206 provides that "no violation occurs 'so long as the total weekly wage paid by the employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.'"  *Walker v. Interstate Distributor Co.*, 2001 U.S. Dist. LEXIS 10941, *12 (9th Cir. 2001) (citing *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (9th Cir. 1986) (quoting *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960))).  In other words, as long as the wages received for a particular work week equal or exceed the minimum wage when divided by the hours worked, there is no violation of the minimum wage obligations of the FLSA.

As will be shown at trial, Plaintiffs have not presented evidence sufficient for the Court to determine that putative class members were paid less than the minimum wage during any workweek at issue in violation of 29 U.S.C. § 206.  Therefore, as a matter of law, Plaintiffs have not presented evidence sufficient for the court to determine that any

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

43.

1   named plaintiff was paid less than the minimum wage during any workweek at issue in

2   violation of 29 U.S.C. § 206.

3       **11.    This Court should dismiss Plaintiffs' claim for overtime under the**
        **FLSA, 29 U.S.C. § 207 and NRS 608.100(1)(b), as a matter of law**
4       **because Plaintiffs are exempt from overtime.**

5           Plaintiffs assert a claim for overtime under the FLSA, 29 U.S.C. § 207 in the second

6   cause of action in the *Greene* Complaint and the first cause of action in the *Baum*

7   Complaint.  Additionally, Plaintiffs assert a claim for overtime under NRS 608.100(1)(b) in

8   the second cause of action in the *Greene* Complaint for "failure to pay overtime

9   compensation required by statute (the FLSA)."  Accordingly, both claims for overtime are

10  based on alleged violations of FLSA, 29 U.S.C. § 207, and exemptions to the FLSA shall

11  apply to both claims.

12      **a.     Defendants are exempt from overtime under the Motor-**
                **carrier exemption.**
13

14          The FLSA mandates that any employee who "is engaged in commerce or in the

15  production of goods for commerce" must be paid a minimum of "one and one-half times the

16  regular rate at which he is employed" for every hour over 40 hours he works in a workweek.

17  29 U.S.C. § 207 (a); *Klem v. Cnty. of Santa Clara, Cal.*, 208 F.3d 1085, 1089 (9th Cir.

18  2000).  The FLSA, however, exempts certain classes of employees from its overtime-pay

19  provision.  *See* 29 U.S.C. § 213(b).  For instance, under the motor-carrier exemption, the

20  FLSA exempts "any employee with respect to whom the Secretary of Transportation has

21  power to establish qualifications and maximum hours of service pursuant to the provisions

22  of section 31502 of Title 49." 29 U.S.C. § 213(b)(1) and *Marguiles v. Tri-County Metro.*

23  *Transp. Dist. Of Or.*, 2013 U.S. Dist. LEXIS 146484 *19-21 (D. Or. October 10, 2013).  "The

24  [motor-carrier] exemption is construed narrowly and the employer seeking the exemption

25  has the burden of proving entitlement." *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1468 (9th

26  Cir. 1997) (citations omitted); *accord Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156

27  (9th Cir. 1994); see also *Klem*, 208 F.3d at 1089 (noting that courts should construe FLSA

28  exemptions narrowly).  Although the Plaintiffs' state overtime claims are completely brought

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

through Defendants' alleged violation of the FLSA, Nevada also exempts "drivers, drivers' helpers, loaders and mechanics for motor carriers subject to the Motor Carrier Act of 1935, as amended" through its own statutes.  NRS 608.018(3)(f).

In determining the applicability of the motor-carrier exemption, courts are guided by 29 C.F.R. § 782.2(a), which provides:

> The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

To establish the Motor Carrier Act exemption, an employer must show two things: first, that the employer itself is subject to the jurisdiction of the Secretary of Transportation and, second, that "'the employee's business-related activities . . . directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.'" *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1213 (11th Cir. 2011) (per curiam), *quoting Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1227 (11th Cir. 2009).  Title 49, United States Code, Section 13501 provides that the Secretary of Transportation has jurisdiction over transportation by a motor carrier:

> (1) between a place in
>
>> (A) a State and a place in another State;
>>
>> (B) a State and another place in the same State through another State;
>>
>> (C) the United States and a place in a territory or possession of the  United  States  to  the  extent  the transportation is in the United States;
>>
>> (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702 862 8800

1
2
3

> (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
>
> (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

4  49 U.S.C. § 13501.    Thus, under the statute's plain language, the Secretary of

5  Transportation does not have jurisdiction overly wholly intrastate transportation. *Reich*, 33

6  F.3d at 1155.    Courts have found that, under certain circumstances, wholly intrastate

7  transportation is subject to the Secretary of Transportation's jurisdiction under 49 U.S.C. §

8  13501. Specifically, when "wholly intrastate commerce is merely part of a 'continuing

9  transportation' in interstate or foreign commerce, . . . the motor carrier is subject to the

10  Secretary of Transportation's jurisdiction." *Id.* at 1155 n.3, *citing Burlington N., Inc. v.*

11  *Weyerhaeuser Co.*, 719 F.2d 304, 309-10 (9th Cir. 1983); *see also Walling v. Jacksonville*

12  *Paper Co.*, 317 U.S. 564, 568, 63 S. Ct. 332, 87 L. Ed. 460 (1943) (finding that, where

13  goods were transported from out of state, temporarily housed in a warehouse, and  then

14  transported intrastate to the customer, the goods were in interstate commerce until they

15  reached their final destination because there was a "practical continuity of movement of the

16  goods").

17  During the relevant time period of 2003 through 2011, the definition of "motor carrier"

18  in 49 U.S.C. § 13102 changed several times.  Prior to August 10, 2005, § 13102 defined a

19  "motor carrier" as a "person providing motor vehicle transportation for compensation."

20  *Avery v. Chariots for Hire*, 748 F. Supp. 2d 492, 497 (D. Md. 2010).  Effective August 10,

21  2005, however, the definition was modified with the Safe, Accountable, Flexible, Efficient

22  Transportation Equity Act: A Legacy for Users (SAFETEA-LU) by striking the phrase "motor

23  vehicle" from the definition and inserting the phrase "commercial motor vehicle (as defined

24  in section 31132)." *Avery* at 497 citing Pub. L. No. 109-59, § 4142(a) (2005) (codified as

25  amended at 49 U.S.C. § 13102(14) (2005).  Section 31132 defined a commercial motor

26  vehicle as a: Self propelled or towed vehicle used on the highways in interstate commerce

27  to transport passengers or property, if the vehicle —

28

> (A) Has a gross vehicle weight rating or gross vehicle weight of

46.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

at least 10,001 pounds, whichever is greater;

(B) is designed or used to transport more than 8 passengers (including the driver) for compensation;

(C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.49 U.S.C. § 31132(1).

*Avery* at 497-498 citing 49 U.S.C. § 31132(1).

This definition stayed in effect until June 6, 2008, when Congress restored the pre-SAFETEA-LU Act definition of motor carrier in the SAFETEA-LU Technical Corrections Act (TCA), so that the definition of motor carrier was no longer limited to drivers of commercial vehicles. *Avery* at 498 citing 49 U.S.C. § 13102(14); Pub. L. No. 110-244 § 305 (2008). The TCA also added a note to section 7 of the Fair Labor Standards Act, which limited the applicability of the motor carrier exemption to the same types of employees covered under SAFETEA-LU's definition. *Id.* Specifically, the TCA added the following note to section 7:

(a) APPLICABILITY FOLLOWING THIS ACT. — Beginning on the date of enactment of this act [June 6, 2008], § 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. § 207) shall apply to a covered employee notwithstanding § 13(b)(1) of that Act [the Motor Carrier Exemption]

(b) COVERED EMPLOYEES DEFINED. — In this section, the term 'covered employee' means an individual —

(1) Who is employed by a motor carrier or private carrier (as such terms are defined by § 13102 of Title 49 of United States Code, as amended by § 305);

(2) Whose work, in whole or in part, is defined-

(A) As that of a driver, driver's helper, loader, or mechanic; and

(B) As affecting the operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles —

(i) Designed or used to transport more than

47.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

> eight passengers (including the driver) for compensation;
>
> (ii) Designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
>
> (iii) Used in transporting material found by the Secretary of Transportation to be hazardous under § 5103 of Title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under § 5103 of Title 49, United States; and
>
> (3) Who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* citing Pub. L. No. 110-244 Title III, § 305 (2008).

In addition to these three periods of different exemptions, the TCA includes a one-year "safe harbor" period from August 10, 2005 to August 9, 2006 if an employer did not have actual knowledge that the employer was subject to the requirements of section 7 of the FLSA with respect to the covered employee. *See* Technical Corrections Act § 306(b)(1)(A)—(B). Thus, from December 19, 2005 through August 9, 2006, an employer would not be liable for violations of the FLSA if the employer had no "actual knowledge" that SAFETEA-LU contracted the scope of the exemption. *Id.*

In sum, four periods of exemption application exist:

> 1. The pre-August 11, 2005 Motor Carrier Act period when all persons providing "motor vehicle" transportation for compensation were exempt from overtime;
>
> 2. The August 11, 2005 through June 5, 2008 SAFETEA-LU period when "motor vehicle" was rephrased as "commercial motor vehicle" with added requirements of gross vehicle weight of at least 10,001 pounds or use in transporting more than 8 passengers (including the driver) for compensation – thereby making drivers of small vehicles non-exempt;
>
> 3. The post-June 6, 2008 TCA period when the pre-SAFETEA-LU (or Motor Carrier Act period) definition of "motor vehicle" was restored but a carve-out exception remained for drivers of motor vehicles weighing 10,000 pounds or less (with an exception to this exception for vehicles used to transport more than eight passengers (including the driver) for compensation) – thereby retaining the non-exempt status for

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

drivers of small vehicles.

4.    The August 10, 2005 to August 9, 2006 safe harbor period for employers having no actual knowledge that SAFETEA-LU contracted the Motor Carrier Act exemption.

Although SAFETEA-LU and the TCA affect the applicability of the Motor Carrier Exemption, Defendants will still be able to show that it was exempt for all applicable periods. As to the pre-August 11, 2005 Motor Carrier Act period, the Defendants will show that AWGCS frequently contracts with customers to provide transportation to and from McCarran International Airport to complete or commence interstate travel and that AWGCS frequently contracts with its affiliated destination management company to provide transportation for groups arriving from out of state that AWGCS driving assignments frequently qualify as part of a continuing transportation in interstate commerce. Further, the Court will show that interstate driving assignments make up more than a *de minimis* amount of AWGCS driving assignments, that interstate driving assignments could be assigned to any AWGCS driver utilizing a vehicle greater than 10,000 pounds. Therefore, as to the first requirement of the Motor Carrier Exemption, AWGCS will show that it is subject to the jurisdiction of the Secretary of Transportation.

Under the second requirement for application of the pre-August 11, 2005 motor carrier exemption, AWGCS must establish that its drivers "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a).

Here, it is undisputed that drivers directly affect the safety of operation of motor vehicles. *See* 29 C.F.R. § 782.2(b)(1). At trial, the Defendants will show that Plaintiffs and putative class members were likely to be called upon in the ordinary course of work to perform, either regularly or from time to time, safety-affecting activities" in the interstate transportation of goods or passengers. 29 C.F.R. § 782.2(b)(3); *see also Resch v. Krapf's Coaches, Inc.*, 2013 U.S. Dist. LEXIS 123438, 2013 WL 4603011, at *6 (E.D. Pa. Aug. 29, 2013) ("[D]efendant does not need to prove that each plaintiff drove interstate regularly, or

49.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   even that they have driven interstate at all; instead, defendant must simply prove that

2   'because of company policy and activity, the driver could reasonably be expected to do

3   interstate driving.'", *quoting Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 417 (3d Cir.

4   1992).  "[I]f a carrier is engaged in interstate work and assigns drivers randomly to that

5   driving, all of its drivers are considered subject to the Motor Carrier Act."  *Sturm v. CB*

6   *Transp., Inc.*, 943 F. Supp. 2d 1102, 2013 U.S. Dist. LEXIS 63779, 2013 WL 1867075, at

7   *8 (D. Idaho May 2, 2013).  Therefore, as a matter of law, Plaintiffs and putative class

8   members are exempt from overtime in the pre-August 11, 2005 Motor Carrier Act period.

9        As to the August 11, 2005 through June 5, 2008 SAFETEA-LU period and the post-

10   June 6, 2008 TCA period, the recent analysis in *Avery v. Chariots for Hire*, 748 F. Supp. 2d

11   492 (D. Md. 2010) is directly applicable to Defendants.  In *Avery*, the plaintiffs "drove motor

12   coaches, limo buses, minibuses, limousines, sedans, sport utility vehicles, and vans" for

13   defendant employer Chariots for Hire.  *Id.* at 494.  The Court examined whether or not the

14   various changes to the Motor Carrier Act through SAFETEA-LU and TCA applied to plaintiff

15   Avery's overtime exemption status while he was driving a vehicle of less than 10,001

16   pounds.  *Id.* at 495.  As to plaintiff's operation of a vehicle less than 10,001 pounds but

17   holding more than eight passengers, the court found that plaintiff was exempt under both

18   SAFETEA-LU and TCA.  *Id.* at 498-499.  As to plaintiff's operation of vehicles under 10,001

19   pounds but holding less than eight passengers, the court still found that plaintiff was

20   exempt as he worked for an employer that used a "mixed fleet."  *Id.* at 499.

21        The *Avery* court found that the general rule is "if the bona fide duties of the job

22   performed by the employee are in fact such that he is called upon in the ordinary course of

23   his work to perform, either regularly or from time to time, safety-affecting activities . . . he

24   comes within the exemption in all workweeks when he is employed at such job."  *Id.* at 499-

25   500 citing 29 C.F.R. § 782.2(b)(3) (2010).  The court held that the rule applies "regardless

26   of the proportion of the employee's time or of his activities which is actually devoted to such

27   safety-affecting work in a particular workweek, and the exemption will be applicable even in

28   a workweek when the employee happens to perform no work directly affecting safety of

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1   operation." *Id.* at 500.  The only exception would be where the duties are *de minimus*.  *Id.*
2   Although the *Avery* court noted that courts were somewhat divided on the proper approach
3   to the mixed fleet issue, the prevailing view was that the motor vehicle exemption should
4   apply so long as the time an employee spends operating commercial motor vehicles is
5   more than *de minimus*.  *Id. citing Hernandez v. Brink's, Inc.*, No. 08-0717-Civ, 2009 U.S.
6   Dist. LEXIS 2726, 2009 WL 113406 *6 (S.D.Fla. Jan. 15, 2009) ("[W]hen mixed activities
7   occur, the Motor Carrier Act favors coverage of the employee during the course of
8   employment."); Dalton v. Sabo, Inc., Civ. No. 09-358-AA, 2010 U.S. Dist. LEXIS 32472,
9   2010 WL 1325613, *4 (D.Ore. 2010)(holding that motor carrier exemption applied to
10  plaintiffs that performed maintenance on a fleet that consisted of vehicles weighing both
11  more and less than 10,000 pounds).

12      As to the policy behind the mixed fleet rule, the Avery court noted that the Court of
13  Appeals for the Seventh Circuit aptly explained, "[d]ividing jurisdiction over the same
14  drivers, with the result that their employer would be regulated under the Motor Carrier Act
15  when they were driving the big trucks and under the Fair Labor Standards Act when they
16  were driving trucks that might weigh only a pound less, would require burdensome record-
17  keeping, create confusion, and give rise to mistakes and disputes."  *Avery* at 500 citing
18  *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 901 (7th Cir. 2009).

19      In this matter, Defendants are clearly within the mixed fleet definition of Avery as
20  they are also in the business of operating motor coaches, limo coaches, buses, limousines,
21  sedans and sport utility vehicles.  Even with this complete defense an individualized
22  analysis will be needed as to each driver's applicable defenses as different periods apply
23  under the Motor Carrier Act, SAFETEA-LU, TCA and the TCA safe harbor period.  Further,
24  some drivers will not even need to be a part of this analysis if they only drove vehicles
25  greater than 10,001 pounds or transporting eight passengers or more.  Alternatively,
26  Defendants will also show that the August 10, 2005 to August 9, 2006 safe harbor period
27  should apply as Defendants never had "actual knowledge" that SAFETEA-LU contracted
28  the scope of the Motor Carrier Act exemption.

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

51.

**b.  Alternatively, Defendants are exempt from overtime under the taxicab exemption.**

Alternatively, as a matter of law, Plaintiffs and putative class members are exempt from the overtime under the Nevada taxicab and limousine exemption and the FLSA taxicab exemption.  Under Nevada statutes, both limousine drivers and taxi drivers are exempt from state minimum wage and overtime regulations.  *See* NRS 608.018(3)(j) and NRS 608.250(2)(e).  More broadly as to "drivers", under federal law, "any driver employed by an employer engaged in the business of operating taxicabs" are exempt from the FLSA's overtime pay requirements.  29 U.S.C. § 213(b)(17).  Thus, unlike the Nevada exemption that only applies to specific "limousine drivers" or "taxi drivers," the FLSA exemption will apply to "any driver" – such as coach drivers or non-taxi drivers – as long as the employer is engaged "in the business of operating taxicabs."

In an unpublished decision, the Eleventh Circuit examined the FLSA's Taxicab Exemption's application to airport shuttle operations from Southern Shuttle.  *Abel v. Southern Shuttle Servs.*, 301 Fed. Appx. 856, 859-861 (11th Cir. 2008).  The court noted that neither the FLSA nor the Code of Federal Regulations defined the phrase "the business of operating taxicabs."  *Id.* at 859.  The court then looked at the Department of Labor's field operations handbook section on the § 213(b)(17) taxicab exemption which discussed the common features of a taxicab as:

> "Business of operating taxicabs".  The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community.  The business operates without fixed routes or contracts for recurrent transportation.  It serves the miscellaneous and predominantly local transportation needs of the community.  It may include such occasional and unscheduled trips to and from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

*Id.* at 859 citing Dep't of Labor, Wage and Hour Division, Field Operations Handbook § 24h01.  Although the court noted that Southern Shuttle did not call itself a taxicab operator

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89169-5937
702.862.8800

1   or its vehicles taxicabs, the court's analysis also turned on whether or not Southern

2   Shuttle's vans fit into the common sense understanding of a taxicab as reflected in the

3   handbook. *Id.* at **8. In this regard, the court found that a taxicab is:

> a small motor vehicle that carries a passenger to any requested
> destination. The passenger: (1) is not required to always have
> an airport destination or airport departure as part of the trip; (2)
> ordinarily is not obliged to share the ride with other passengers;
> and (3) is taken directly to his or her requested destination.

7   *Id.* Although not bound by municipality definitions, the court also looked at Broward County

8   and Miami-Dade County's definition of taxicabs as holding eight passengers and being a

9   "vehicle equipped with a meter." *Id.* at **9-10.

10       Here, the Defendants are in the taxicab business because it operates sedans, SUVs

11   and limousines that fall under the *Abel* court's definition of taxicabs.  Defendants' sedans,

12   SUVs and limousines are small motor vehicles that will carry a passenger to any requested

13   destination – even across state lines.  Defendants' sedan and limousine passengers are

14   not required to have an airport destination as part of the trip, are not obliged to share rides

15   and are taken directly to a requested destination.  Further, the Defendants' sedans and

16   limousines are regulated by the Nevada Transportation Authority which is the same agency

17   that regulates all general taxicab operators.

18       Like in *Abel* the Court can look to the Nevada Revised Statutes for definitions of

19   taxicabs.  Unlike in *Abel*, however, the Nevada Revised Statutes definition of taxicabs is

20   much broader and not restricted to metered vehicles.  Under NRS 706.124, "Taxicab" is

21   defined as follows:

> "Taxicab" means a vehicle which is not operated over a fixed
> route, is designed or constructed to accommodate and transport
> not more than six passengers, including the driver, and is:
>
>      1.   Fitted with a taximeter or has some other device,
> method or system to indicate and determine the passenger fare
> charged for the distance traveled;
>
>      2.   Used in the transportation of passengers or light
> express, or both, for which a charge or fee is received; or
>
>      3.   Operated in any service which is held out to the
> public as being available for the transportation of passengers

LITTLER MENDELSON, P.C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

from place to place in the State of Nevada.

Thus, even under Nevada's definition, Defendants' six passenger vehicles that are (1) used in the transportation of passengers for which a charge or fee is received or (2) operated in any service which is held out to the public as being available for the transportation of passengers from place to place in the State of Nevada.  Therefore, Defendants' sedans, SUVs and limousines are taxicabs and exempt its operator from both federal and state overtime requirements.

   **c.  Alternatively, Plaintiffs have not provided sufficient evidence that putative class members were not paid overtime.**

Alternatively, as a matter of law, even if Plaintiffs were not exempt from the overtime requirements of the FLSA by virtue of exemptions, Plaintiffs have provided insufficient evidence to establish that Plaintiffs or putative class members were employed during any workweek where they worked in excess of 40 hours and were not paid one and one-half their regular hourly rate for such work.  Therefore, there is no class representative evidence of an overtime violation.

**IV.   CONCLUSION**

At trial, Plaintiffs will be unable to bear their burden to prove by a preponderance of the evidence a (1) collective or Rule 23 class should be certified or alternatively, (2) that the Defendants committed violations of minimum wage, overtime and related claims.

Dated:  July 23, 2014

Respectfully submitted,

RICK D. ROSKELLEY, ESQ.
WENDY MEDURA KRINCEK, ESQ.
MONTGOMERY Y. PAEK, ESQ.
MARCUS B. SMITH, ESQ.
Attorneys for Defendants

54.

1

2

3                          **PROOF OF SERVICE**

4       I am a resident of the State of Nevada, over the age of eighteen years, and not a

5   party to the within action. My business address is 3960 Howard Hughes Parkway, Suite

6   300, Las Vegas, Nevada  89169-5937. On July 23, 2014, I served the within document(s):

7                          **DEFENDANTS' TRIAL BRIEF**

8            ☒       by **HAND DEIVERY** - personally delivering a copy of the document(s) listed
                     above to the person(s) set forth below.
9

10
         Mark R. Thierman, Esq.              Jason J. Kuller, Esq.
11       Thierman Law Firm                   Kuller Law PC
         7287 Lakeside Drive                 10775 Double R. Blvd.
12       Reno, NV 89511                      Reno, NV 89521

13       Patrick Kyle Smith, Esq.
         Lynch Hopper Salzano & Smith
14       1640 Alta Drive
         Suite 11
15       Las Vegas, NV 89106

16

17       I declare under penalty of perjury that the foregoing is true and correct. Executed on

18   July 23, 2014, at Las Vegas, Nevada.

19
                                    _____
20                                  Wendy M. Krincek, Esq.

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C
     Attorneys At Law
3960 Howard Hughes Parkway
       Suite 300
 Las Vegas, NV  89169-5937
     702.862.8800

                                        55.